IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION
No. 5:07-CR-42-D

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | **ORDER** |
| | ) | |
| JAMES BOYCE BLACK, | ) | |
| | ) | |
| Defendant. | ) | |

On February 15, 2007, defendant James Boyce Black (a/k/a "Jim Black") ("Black" or

"defendant") pleaded guilty in this court to violating 18 U.S.C. § 666(a)(1)(B). Between 2000 and

2005, Black was the Speaker of the North Carolina House of Representatives. According to the

government's factual basis presented at Black's arraignment, Black's criminal conduct took place

between 2000 and December 2005 and included accepting approximately $25,000 in cash and a

$4,000 check from chiropractors, intending to be rewarded in connection with the business of state

government. At defendant's February 15, 2007, arraignment, the court notified the parties that

defendant's sentencing would take place during the May 14, 2007, term of court.

On May 3, 2007, defendant filed a motion to recuse pursuant to 28 U.S.C. §§ 455(a),

455(b)(1), and 455(b)(2). Black does not seek recusal under 28 U.S.C. § 144, and his motion does

not allege that I am personally biased or prejudiced against him. See Def.'s Mot. to Recuse 3 n.1.[1]

Rather, the motion alleges that I should recuse myself because I may have "personal knowledge of

---

[1] 28 U.S.C. § 144 states in part:

Whenever a party to any proceeding in a district court makes and files a timely and
sufficient affidavit that the judge before whom the matter is pending has a personal
bias or prejudice either against him or in favor of any adverse party, such judge shall
proceed no further therein, but another judge shall be assigned to hear such
proceeding. . . .

28 U.S.C. § 144.

disputed evidentiary facts concerning the proceeding" (28 U.S.C. § 455(b)(1)), and because I allegedly, while "in private practice . . . served as a lawyer in the matter in controversy, or a lawyer with whom [I] previously practiced law served during such association as a lawyer concerning the matter . . . ." 28 U.S.C. § 455(b)(2). Alternatively, the motion seeks my recusal under the "catch-all" recusal provision in section 455(a) because my "impartiality might reasonably be questioned." Id. § 455(a).

Essentially, the motion to recuse is based on a redistricting lawsuit that took place primarily in North Carolina state court between November 2001 and July 2003. At the time of that redistricting lawsuit, I was in private practice in Raleigh. In the litigation, Thomas Farr and I were lawyers who represented five Republican voters ("plaintiffs"). The plaintiffs challenged the constitutionality under the North Carolina Constitution of a November 2001 redistricting statute for North Carolina House and Senate legislative districts. In the lawsuit, plaintiffs sought injunctive relief to prevent the State of North Carolina from using the November 2001 redistricting statute. Plaintiffs sued the following ten North Carolina officials in their official capacity: the Executive Director of the State Board of Elections, the five members of the State Board of Elections, the Speaker of the North Carolina House of Representatives, the President Pro Tempore of the North Carolina Senate, the Governor of North Carolina, and the Attorney General of North Carolina. See Stephenson v. Bartlett, 355 N.C. 354, 562 S.E.2d 377 (2002) ("Stephenson I"). By definition, such official-capacity lawsuits seek relief only from the government (i.e., the State of North Carolina) and do not seek personal relief against any public official. In April 2002, the Supreme Court of North Carolina held that the November 2001 redistricting statute violated the North Carolina Constitution and enjoined its use. See id. In July 2003, the Supreme Court held that the May 2002 redistricting statute violated the North Carolina Constitution and affirmed the state trial court's May 2002

2

remedy. See Stephenson v. Bartlett, 357 N.C. 301, 582 S.E.2d 247 (2003) ("Stephenson II").

On February 9, 2004, I left private practice and was appointed a United States Magistrate Judge. I served in that capacity from February 9, 2004, until May 3, 2005. On May 3, 2005, I was appointed a United States District Judge. I have served in that position since May 3, 2005.

On May 11, 2007, the United States responded in opposition to the defendant's motion to recuse. On that same date, defendant filed a motion to supplement his motion to recuse.[2]

As explained in Part II of this order, the court denies defendant's motion to recuse under section 455(b)(1) and section 455(b)(2). I do not have "personal knowledge of disputed evidentiary facts concerning the proceeding." 28 U.S.C. § 455(b)(1). Also, while in private practice, I never "served as a lawyer in the matter in controversy," and neither did any lawyer with whom I previously practiced law. Id. § 455(b)(2). As explained in Part III of this order, the court denies defendant's motion to recuse under section 455(a). Nothing that this court has said or done creates an appearance of bias. Nevertheless, as explained in Part IV of this order and on the court's own motion, I do recuse in the public interest from further proceedings in Black's case. Accordingly, the Clerk of Court is ordered to reassign this case for all further proceedings to another district judge in the Eastern District who accepts criminal cases. The reassignment shall be done through the Clerk's standard, neutral, random assignment process.

I.

To put defendant's motion to recuse into context, the court describes the record at some length. Initially, the court discusses the August 2006 criminal action in this court concerning former North Carolina Representative Michael Decker ("Decker"). The court then discusses the February

---

[2]The court grants defendant's motion to supplement his motion to recuse.

2007 criminal actions in federal and state court concerning Black. As part of its analysis of Black's arguments concerning recusal, the court will discuss the Stephenson redistricting litigation, section 455(b)(1), section 455(b)(2), and section 455(a).

A.

On August 1, 2006, Decker appeared in this court and pleaded guilty, pursuant to a plea agreement, to conspiracy to commit extortion under color of official right, honest services mail fraud, and money laundering in violation of 18 U.S.C. § 371.

The criminal information to which Decker pleaded guilty on August 1, 2006, stated:

Beginning in or about mid-November of 2002 and continuing through in or about March of 2006, in the Eastern District of North Carolina and elsewhere, MICHAEL P. DECKER, SR. ("DECKER"), defendant herein, knowingly and unlawfully combined, conspired, agreed, and confederated with others, to commit offenses against the United States, specifically:

a. To affect commerce by extortion, that is, by the obtaining of property from another person, with the person's consent, under color of official right, in violation of Title 18, United States Code, Section 1951;

b. To knowingly use, and cause others to use, the mail for the delivery and receipt of matters and things for the purpose of executing a devised scheme and artifice to defraud the State of North Carolina and its citizens of the right to DECKER'S honest services as a member of the North Carolina House of Representatives, in violation of Title 18, United States Code, Sections 1341 and 1346; and

c. To conduct financial transactions involving the proceeds of specified unlawful activity, to wit, extortion and mail fraud, knowing that the property involved in said transactions represented the proceeds of some form of unlawful activity, and knowing that the transactions were designed in whole or in part to conceal and disguise the nature, location, source, ownership, and control of the proceeds of specified unlawful activity, in violation of Title 18, United States Code, Section 1956(a)(1)(B)(i).

Overt Acts

In furtherance of the conspiracy and to effect the objects thereof, DECKER and other conspirator(s) did, in the Eastern District of North Carolina and elsewhere, commit numerous overt acts, some of which are detailed below.

4

1. After the results of the general election of November, 2002, left the North Carolina House of Representatives with 61 Republican members and 59 Democratic members, DECKER solicited and agreed to accept $50,000 and other things of value in return for switching from the Republican Party to the Democratic Party and supporting a particular candidate for Speaker of the House.

2. On January 24, 2003, DECKER changed his party registration from Republican to Democrat and publicly announced the switch.

3. On January 24, 2003, four checks totaling $2500 and made payable to DECKER'S campaign were sent by private commercial carrier from Raleigh, NC, to another location in North Carolina.

4. Later in 2003, DECKER accepted an envelope containing about $38,000 in checks, including the ones described in Overt Act No. 3, and $12,000 in cash in return for switching parties and supporting a particular candidate for Speaker of the House.

5. After his reelection bid failed in the Republican primary of July, 2004, DECKER agreed to keep his campaign account open in case there was a need to run some money through it. On or about February 10, 2005, DECKER received a $4000 check payable to his campaign, deposited it in his campaign account, promptly closed out the account, and converted the money to his personal use.

United States v. Decker, No. 5:06-CR-197-1-D, Crim. Inf. (E.D.N.C. Aug. 1, 2006).

At Decker's arraignment on August 1, 2006, Assistant United States Attorney John Bruce provided the following proffer as to a factual basis for Decker's plea:

If this case proceeded to trial, the government would show by competent evidence the following: Mr. Decker was elected ten times as a Republican to the North Carolina House of Representatives for Forsyth County. The last time being 2002.

During this time in the House, he had never been a prolific fundraiser. After the results of the 2002 election were fully counted, the Republicans had gained a 61/59 advantage. There followed a period of uncertainty as to who would be the Speaker for the 2003/2004 session of the North Carolina General Assembly.

The Speaker of the House wields great power in operation of the House, including committee staff and office assignments, appointments to boards and commissions, determining the state of legislation, and the composition of the budget.

Mr. Decker was experiencing personal financial difficulties. In late 2002, Mr.

Decker and another Republican House member met twice in Salisbury, North Carolina with a Democratic member of the House. At the second meeting, Mr. Decker spoke privately with the Democratic member of the House. At this time Mr. Decker offered to switch to the Democratic party and support a certain Democratic member of the House for Speaker in return for $50,000. The Democratic member agreed and proposed it be done with campaign checks. Mr. Decker agreed. Mr. Decker was also promised one full paid staff position would be assigned to him.

Pursuant to the agreement, on Friday, January 24, 2003, Mr. Decker went to the Forsyth County Board of Elections, changed his party representation from Republican to Democrat, and publicly announced that fact.

Meanwhile, checks to the Decker campaign fund were being gathered from persons who had never contributed to his campaign before. For example, on the very day that Mr. Decker announced his party switch, four checks totaling $2,500 from four individuals who had never before contributed to Decker's campaigns, were sent by Fed Ex for Saturday delivery from Raleigh, North Carolina to another location in North Carolina.

The 2003 legislative session began on January 29, 2003, with the House evenly divided, because of Mr. Decker's switch, between 60 Democrats and 60 Republicans. After an eight day stalemate, co-speakers were elected. Around this time, the person with whom Mr. Decker had struck this deal in Salisbury, gave Mr. Decker an envelope containing checks totaling approximately $38,000 together with $12,000 in cash.

Mr. Decker quickly converted some of the money to his personal use, including buying a car in Florida and traveling there to pick it up.

Mr. Decker also received the promised legislative staff position, which was filled by his son, and over the next several years, Mr. Decker received other things of value.

In 2004, Mr. Decker switched his registration back to Republican and ran for re-election. He was defeated in the Republican Primary on July 20, 2004. After his defeat, Mr. Decker was advised to leave his campaign account open in case there was a need "to run some money through it." On or about February 10, 2005 he received a $4,000 check payable to his campaign. He deposited the check in his campaign account, closed the account, and converted money to his personal use.

Id., Arraignment (E.D.N.C. Aug. 1, 2006). On August 1, 2006, this court conducted an arraignment in accordance with Rule 11 of the Federal Rules of Criminal Procedure and accepted Decker's guilty plea. Id. Initially, the court scheduled Decker's sentencing for November 1, 2006. Id.

On October 17, 2006, the United States moved to continue Decker's sentencing. On October 18, 2006, the court granted the motion to continue the sentencing until the February 5, 2007, term of court, but advised the parties that it would hold a hearing on November 1, 2006, concerning Decker's Sixth Amendment rights. See id., Order (E.D.N.C. Oct. 18, 2006). On October 31, 2006, Decker filed an affidavit stating that Black had paid Decker's lawyer $5,000 in June 2005. According to Decker's affidavit, Black made this payment shortly after Decker received a federal grand jury subpoena in June 2005 concerning a criminal investigation in the Eastern District of North Carolina. During the November 1, 2006, hearing, Decker identified Black as his co-conspirator. At the end of the hearing, the court found that Decker understood his Sixth Amendment rights. The court also held that there was no conflict of interest in having Decker's lawyer continue to represent Decker, even though Black (or his campaign) had paid Decker's lawyer. See id., Minute Entry for Proceedings (E.D.N.C. Nov. 1, 2006).

On January 4, 2007, the United States filed a second motion to continue. On January 8, 2007, the court continued Decker's sentencing hearing until the court's April 23, 2007, term of court. See id., Order (E.D.N.C. Jan. 8, 2007).

B.

On February 15, 2007, Black appeared in this court with his counsel Kenneth Bell. Black waived his right to prosecution by indictment and consented to proceeding by criminal information. This court conducted an arraignment in accordance with Rule 11 of the Federal Rules of Criminal Procedure and accepted Black's guilty plea to a one-count criminal information that charged him with violating 18 U.S.C. § 666(a)(1)(B). See United States v. Black, No. 5:07-CR-42-1-D, Arraignment (E.D.N.C. Feb. 15, 2007). The information stated:

At all times material to this Information:

7

1. JAMES BOYCE BLACK, a/k/a Jim Black, was Speaker of the North Carolina House of Representatives. In said position, he wielded great influence over legislation and conducted state business on a regular basis.

2. During every one-year period covered by this Information, the government of the State of North Carolina received benefits in excess of $10,000 under Federal programs involving various forms of Federal assistance, including, but not limited to, Medicaid.

3. Individual chiropractors and members of the North Carolina Chiropractors Association had an interest in potential legislation before the North Carolina General Assembly, including, but not limited to: (1) "spinal safety" laws; (2) legislation affecting the amount of co-payments insurers could require patients to pay chiropractors; and (3) legislation requiring that insurers' review of chiropractic treatment be performed by a licensed chiropractor. Such proposed legislation impacted Federal programs involving forms of Federal assistance, including, but not limited to, Medicaid.

CHARGE

Beginning in the year 2000 and continuing through 2005, JAMES BOYCE BLACK, a/k/a Jim Black, defendant herein, being an agent of a State government, and under the circumstance described in Paragraph 2 above, did corruptly, knowingly, and willfully solicit for his own benefit, and did accept and agree to accept, things of value, that is, money in the form of U.S. currency, from several persons, specifically, members of the chiropractic profession, intending to be rewarded in connection with business of said State government involving things of value of more than $5,000.

All in violation of Title 18, United States Code, Section 666(a)(1)(B).

Id., Crim. Inf. (E.D.N.C. Feb. 15, 2007).

As part of the process of taking Black's plea of guilty, the United States filed in open court

its proffer of the factual basis for the guilty plea. See id., Factual Basis (E.D.N.C. Feb. 15, 2007).

According to the factual basis,

1. From 1999 to 2006, the defendant James Boyce Black a/k/a Jim Black served as Speaker of the North Carolina House of Representatives. In such position, he wielded great influence over legislation and other state business, such as the budget of the State of North Carolina. All state laws and appropriations of state funds must pass both houses of the North Carolina General Assembly ("the Legislature"), which consists of the Senate and the House of Representatives.

8

2. During every one-year period while Jim Black was Speaker, the State of North Carolina received millions of dollars in benefits under scores of Federal programs involving various forms of Federal assistance. Among such programs receiving such Federal assistance are many that impact health care services, including Medicaid.

3. Speaker Black raised money from many different individuals in interest groups who had an interest in matters before the legislature. Among these groups were individual chiropractors who were members of the North Carolina Chiropractic Association. These chiropractors had several legislative goals during the years that Jim Black served as Speaker, including, but not limited to:

a. "Spinal safety" laws: The chiropractors sought passage in the legislature of laws limiting who would be permitted to treat patients by manipulating their spine so that such acts could only be performed by licensed chiropractors and certain other health care professionals.

b. Patient co-payments: The chiropractors sought legislation prohibiting health insurers from requiring patients to pay higher co-payments for visit to chiropractors than for visits to physicians. During the 2005 legislative session, Speaker Black caused legislation to be drafted to accomplish this goal, and helped get it inserted into the House version of the Budget Bill (Senate Bill 622). The provision was ultimately passed into law. See North Carolina Session Laws, 2005-276, § 6.29, amending N.C. Gen. Stat. § 58-50-30 (a3).

c. "Chiropractic Treatment Review": The chiropractors sought legislation requiring that any evaluation of the appropriateness or effectiveness of chiropractic services be performed by licensed chiropractors with an active practice. Legislation was drafted to accomplish this and it was introduced during the 2006 legislative session as House Bill 2869. The legislation would have had broad application to any form of public or private health insurance wherein the medical necessity of treatment was reviewed. Speaker Black helped the bill advance, but then later decided not to bring it to a vote during that session, telling one of the chiropractors that he did not want to cause controversy.

4. Between 2000 and February of 2002, Speaker Black approached two chiropractors and informed them that cash payments would be more helpful than campaign contributions made by check. The two chiropractors agreed to provide Speaker Black with cash payments and ultimately recruited a third chiropractor to provide cash payments to Speaker Black.

5. During the period from February, 2002, through December, 2005, the three chiropractors planned fund-raisers for Speaker Black, met with Speaker Black to discuss legislation relevant to their practice, made in-kind payments for the benefit of Speaker Black which were not reported by Speaker Black to the North Carolina

9

Board of Elections, and delivered cash payments totaling at least $25,000 to Speaker Black.

6. In February of 2002, the chiropractors met Speaker Black at a private dining club in Charlotte and delivered $8,000 in cash to speaker Black. In December of 2002, the chiropractors again met with Speaker Black at a private dining club in Charlotte and delivered approximately $10,000 in cash to Speaker Black. On or about February 14, 2004, approximately 15 members of the North Carolina Chiropractic Association held a fund-raiser for Speaker Black at a restaurant in Concord, North Carolina. During this event, two of the chiropractors met Speaker Black in a restroom for the purpose of secretly delivering cash payments totaling at least $4,000. At the same event, a third chiropractor provided Speaker Black with a check, in the amount of $4,000, made payable simply to "Jim Black." Speaker Black deposited this check into his personal bank account.

7. On December 3, 2005, a fund-raiser for Speaker Black was held by a group of chiropractors at the Capital Grille in Charlotte, North Carolina. During the fund-raiser, a chiropractor met Speaker Black in a restroom in order to secretly deliver to Speaker Black a $3,000 cash payment. When a restaurant employee entered the restroom, the chiropractor and Speaker Black stepped just outside the restroom and completed the delivery. Upon receiving the $3,000 in cash, Speaker Black stated to the chiropractor, "This is just between me and you. Don't you ever tell anybody about this."

8. The three chiropractors who made cash payments to Speaker Black each received a Grand Jury subpoena requiring their appearance before a Federal Grand Jury in Raleigh, on August 16, 2006. On August 15, 2006, Speaker Black personally visited one of the chiropractors. Indicating that he aware of the subpoenas, Speaker Black suggested that the three chiropractors should tell the Grand Jury that the cash payments to Speaker Black consisted of "a little bit of money to help [Black] with expenses along the road while [Black] was out running around the country."

9. Speaker Black did not deposit the aforementioned cash payments totaling at least $25,000 into the bank account of his campaign and did not report the payments to the North Carolina State Board of Elections as campaign contributions. In receiving these payments and converting them to his own use, Speaker Black intended to be rewarded in connection with the business of state government in which he participated, said state business involving millions of dollars.

Id. at 1-5.

Black entered his guilty plea pursuant to a written memorandum of plea agreement. See id., Mem. of Plea Agreement (E.D.N.C. Feb. 15, 2007). In the memorandum, Black agreed to a number

of things. He also acknowledged that "the Court will take into account, but is not bound by, the applicable United States Sentencing Guidelines, that the sentence has not yet been determined by the Court, that any estimate of the sentence received from any source is not a promise, and that even if a sentence up to the statutory maximum is imposed, the Defendant may not withdraw the plea of guilty." Id. ¶ 3c. The United States Attorney's office agreed to a number of things in the memorandum, but did not promise "to move for a departure pursuant to U.S.S.G. § 5K1.1, 18 U.S.C. § 3553(e), or Fed. R. Crim. P. 35." Id. ¶ 4d. The parties also agreed to certain positions as to certain sentencing factors under the advisory guidelines, but acknowledged those positions were "not binding on the Court . . . ." Id. ¶ 5. During Black's arraignment, the court advised him that sentencing would take place at the May 14, 2007, term of court. At the conclusion of Black's arraignment, the court released him on a $10,000 unsecured bond. See id., Minute Entry for Proceedings (E.D.N.C. Feb. 15, 2007).

## C.

On February 20, 2007, Black appeared in Wake County Superior Court with his counsel Kenneth Bell and entered an Alford guilty plea to a two-count information filed by Wake County District Attorney Colon Willoughby. See North Carolina v. Alford, 400 U.S. 25 (1970). First, Black pleaded guilty to offering a bribe and giving a bribe to Decker in the form of United States currency and checks. The information stated:

> that on or between November 6, 2002, and February 19, 2003, in Wake County, the defendant named above unlawfully, willfully and feloniously did with corrupt intent offer and give a bribe in the form of United States currency and checks to Michael Decker, a Representative in the North Carolina House of Representative. At the time this money and these checks were offered and given to Michael Decker by the defendant [Black], the defendant [Black] knew that Michael Decker was a Representative and it was intended that this money and these checks would influence his performance of an official duty, to wit: voting in the election for the Speaker of the House of Representatives. This official act lay within the scope of the official

11

authority of Michael Decker and was connected with the discharge of his official and legal duties. This act was done in violation of N.C.G.S. § 14-218 and against the peace and dignity of the State.

State v. Black, No. 07CRS10444, Inf. ¶ 1 (Wake County Super. Ct. Feb. 20, 2007). Second, Black

pleaded guilty to obstruction of justice. Specifically,

> on or between February 14, 2002, and December 3, 2005, in Wake County, [Black] unlawfully, willfully and feloniously did in secret and with malice obstruct public justice in his role as a candidate for the North Carolina House of Representatives by soliciting and collecting campaign contributions in the form of checks that had blank payee lines and cash. [Black] converted the cash and checks for his own use and failed to turn the contributions over to the treasurer of the Jim Black Campaign, causing her to file campaign finance disclosure reports to the State Board of Elections that were not complete, true, and correct in that the reports did not disclose these contributions and expenditures. This act was done in violation of the Common Law and against the peace and dignity of the State.

Id. ¶ 2.

At the plea hearing in Wake County Superior Court, Judge Donald W. Stephens explained

Black's rights under federal and state law. See id., Tr. 9-18 (Wake County Super. Ct. Feb. 20, 2007)

(hereinafter "State Tr. __"). Additionally, Black executed a Transcript of Plea concerning his guilty

plea. Among other things, Black wrote "Yes" in response to the question: "Do you understand that,

upon your Alford guilty plea, you will be treated as being guilty whether or not you admit that you

are in fact guilty?" Id., Tr. of Plea, ¶ 13(c)(2) (Wake County Super. Ct. Feb. 20, 2007). Black's

counsel Kenneth Bell and Wake County District Attorney Colon Willoughby also signed the

Transcript of Plea. See id.[3]

---

[3]The court has reviewed the state-court criminal information, a transcript of the February 20, 2007, plea hearing, and a copy of the Transcript of Plea (including a copy of District Attorney Willoughby's letter of February 16, 2007, memorializing the state-court plea agreement). The court has and properly can take judicial notice of these state-court documents. See, e.g., Fed. R. Evid. 201; Colonial Penn Ins. Co. v. Coil, 887 F.2d 1236, 1239 (4th Cir. 1989) ("'[t]he most frequent use of judicial notice of ascertainable facts is in noticing the content of court records.'"). The court orders that the state-court criminal information, the transcript of the arraignment, and the Transcript of Plea be included in the record in this case.

Before Judge Stephens accepted Black's guilty plea, District Attorney Willoughby presented two witnesses: Kim Westbrook Strach and Randy Myers. Strach was Deputy Director in the Campaign Finance Division of the North Carolina Board of Elections ("Board of Elections"). See State Tr. 18.[4] Strach testified that the Board of Elections' investigation of Black's campaign finances began in June 2004 after Bob Hall of Democracy North Carolina filed a complaint alleging "violations by contributors to the Committee to Elect Jim Black that were involved in the video poker industry." Id. at 19. "From investigating that, [the Board of Elections began] looking at other political committees as well." Id. The investigation examined contributions from optometrists and the North Carolina State Optometric Society Political Action Committee. Id. at 20-21. The investigation revealed that Decker received $12,000 in the form of blank-payee-line checks from Black, and that Black solicited and raised $46,350 on behalf of Decker in 2003. Id. at 24-26. Decker submitted a campaign finance report for the period January 1, 2005, through July 29, 2005. Id. at 27. In that reporting period, Decker was no longer a member of the North Carolina House of Representatives. Nevertheless, on February 10, 2005, Black's campaign committee contributed $4,000 to Decker. Id. at 27-28.

Strach testified about the report filed by the Committee to Elect Jim Black concerning the first quarter of 2002. Id. at 28. The campaign did not report any cash contributions. Id. Black's campaign bank account for that period also did not contain any cash deposits for that period. Id. Likewise, neither Black's campaign report for the final quarter of 2002 nor his campaign bank account reflected any cash contributions for the year 2002. Id. at 29-30. The campaign report also

---

[4]The Board of Elections is a bipartisan, five-person, independent, quasi-judicial agency charged with administering elections and campaign finance disclosures in North Carolina. See N.C. Gen. Stat. § 163-19 et seq.

13

did not mention the $12,000 in blank-payee-line checks that Black provided Decker. Id. at 30.

Strach testified about Black's campaign report for mid-year 2003. Id. Black's campaign did not report the receipt of any blank-payee-line checks for the first half of 2003. Id. at 31. The report did, however, reflect expenditures at the Red Roof Inn in Raleigh for January 22, 2003, February 6, 2003, and February 20, 2003. Id. The expenditures at the Red Roof Inn totaled $729.78. Id.

Strach testified that she had examined the disclosure report for the Committee to Elect Jim Black for the first quarter of 2004. Id. That report did not reflect any cash contributions. Id. at 32. Likewise, the campaign's bank records for the first quarter of 2004 did not reflect any cash contributions. Id. Similarly, neither the year-end disclosure report for 2005 nor the campaign's bank records reflected any cash deposits. Id. at 33. Also, Black's campaign disclosure reports for 2002 through 2005 only disclosed one $250 cash deposit in early 2005. Id. Black's campaign never reported receiving any cash contributions from Dr. Fletcher Keith, Dr. Steve Willen, or Dr. Thomas Brown. Id. at 34.

The second witness was Special Agent Randy Myers of the North Carolina State Bureau of Investigation ("SBI"). Id. at 36.[5] Agent Myers testified that he was the SBI case agent for the investigation and that he had participated in a joint investigation with the FBI, IRS, and the Board of Elections. Id. at 37. The investigation focused on three groups of contributors to Black: optometrists, chiropractors, and video poker operators. Id. at 38. The investigation revealed that certain optometrists were writing blank-payee-line checks. Id. at 39. The checks were usually made out for hundreds of dollars. Id. The optometrists would write a series of 10 or 12 checks and

---

[5]The North Carolina State Bureau of Investigation is a law enforcement division located within the North Carolina Department of Justice. See N.C. Gen. Stat. § 114-12. The North Carolina Attorney General is the head of the North Carolina Department of Justice and the State Bureau of Investigation. See id. §§114-1, 114-12.

pass them to Dr. Scott Edwards of the North Carolina State Optometric Society Political Action Committee. Id. Edwards, in turn, gave some of the checks to Black who gave them to Decker. Id. at 40. Black's campaign reports did not disclose the blank-payee-line checks that Black provided to Decker. Id. at 41.

According to Agent Myers, in 2006, the Board of Elections held a public hearing concerning Black's campaign finance operation. At that hearing, Black admitted to filling in Decker's campaign name on $4,200 worth of those blank-payee-line checks. Id.

Agent Myers also testified about interviewing Decker. Id. at 42. According to Myers, Decker stated that after the November 2002 election, the North Carolina House had 61 Republicans and 59 Democrats. Id. Decker was a Republican. Id. Decker said that when he (Decker) learned that he would not receive a leadership position, Decker arranged to meet with Black. Id. at 42. Decker (along with Representative Wood) met with Black at a restaurant in Salisbury, North Carolina. Id. at 43. According to Decker, they discussed a co-speakership. Id. At the end of the meeting, Decker did not believe he or Representative Wood "was going to have a chance at a co-speakership with Representative Black." Id.

According to Agent Myers, at the end of the meeting, Decker indicated to Black that he possibly could help Black be co-speaker. Id. Decker and Black then went to the restaurant bathroom together. In the bathroom, Decker told Black that he would change parties to Democratic and vote for Black as Speaker if Black gave him $50,000 cash, including $20,000 up front. Id. at 43-44. In response, Black asked whether instead of cash, he could give Decker campaign checks because they would be easier to explain away. Id. at 44. Decker responded that checks would be fine. Id. Decker also told Black that he wanted a job to be created with a $50,000 per year salary and that he (Decker) wanted control over who would fill that job. Id. at 44-45.

Agent Myers testified that Decker later met with Black in Black's office at the General Assembly. Id. at 46-47. The meeting took place before the election for Speaker, which occurred on February 5, 2003. Id. at 47. In the meeting, Black gave Decker a manilla envelope with $12,000 in cash and a number of checks totaling a bit less than approximately $37,000. Id.

According to Agent Myers, Decker stated that Black later gave him another envelope with just checks. Id. at 48. Further, later in the spring of 2003, Black gave Decker $4,000 in checks. Id. As to the $4,000 in checks, Decker told Agent Myers that an administrative job had been created for him and that he (Decker) had appointed his son Michael Decker, Jr. to that job. Id. Later, Decker complained to Black that the job only paid $46,000. Id. Thereafter, Black gave Decker $4,000 in blank-payee-line checks. Id. Decker filled in his name and cashed those checks in May 2003. Id. at 49.

During Black's arraignment in Wake County Superior Court, the State introduced (through Agent Myers) a copy of the transcript and plea of Decker to the one-count criminal information that took place in this court on August 1, 2006. Id. at 50.

Agent Myers then testified about interviewing Dr. Fletcher Keith, Dr. Steve Willen, and Dr. Tom Brown. See id. at 50-51. According to Agent Myers, Dr. Keith, Dr. Willen, and Dr. Brown are chiropractors in Charlotte. Dr. Keith told Agent Myers that Black solicited a campaign contribution from him in late 2001 or early 2002. Id. at 51, 53. According to Agent Myers, Dr. Keith stated that Black told him that cash would help him. Id. at 52.

Dr. Keith told Agent Myers about an incident on February 14, 2002. Id. at 53. Dr. Keith met with Black and gave him $4,000 in cash at the Capital Grille in Charlotte. Id. Dr. Keith had written a check to cash for $4,000 and provided Agent Myers a copy of that cancelled check. Id. at 53-54. Dr. Keith also told Agent Myers about meetings that he had with Black in December 2002, at the

16

Tower Club in Charlotte, on February 14, 2004, in Concord, and at the Capital Grille in Charlotte. Id. at 55-56.

Additionally, Agent Myers described a meeting that Black had with Dr. Keith on August 15, 2006. On that date, Black called Dr. Keith and told him that his shoulder was bothering him and asked to see Dr. Keith. Id. at 57. Dr. Keith was scheduled to appear before a federal grand jury in the Eastern District of North Carolina on August 16, 2006. Id. Black arrived and met with Dr. Keith in his office. Id. at 58. Black told Dr. Keith that he (Black) was worried about the cash. Id. Black asked Dr. Keith if he could talk to those "boys" and ask them to say, when or if they were questioned about the cash, that they had given a little bit of money to Black to help him with expenses as he was running around the country. Id.

Agent Myers also testified about interviewing Dr. Willen. Id. at 58. Dr. Willen told Agent Myers that he was present during the initial conversation in late 2001 or early 2002 between Black and Dr. Keith. Id. He reiterated that Black said that cash would help him. Id. at 59.

Dr. Willen told Agent Myers that he gave $4,000 in cash to Black at a luncheon meeting on February 14, 2002. Id. Dr. Willen also told Agent Myers that he gave $4,000 in cash to Black on December 12, 2002. Id. at 60-61. Dr. Willen also told Agent Myers that he gave Black $4,000 in cash on February 14, 2004, in the bathroom of a restaurant in Concord, North Carolina. Id. at 61. Finally, Dr. Willen told Agent Myers that he gave Black $3,000 in cash on December 3, 2005, just outside the bathroom door at the Capital Grille. Id. On December 3, 2005, Black told Dr. Willen: "Don't you tell anybody about this; this is just between you and me." Id. at 62.

Dr. Willen told Agent Myers that in January 2003, Black asked Dr. Willen if he would contribute to Representative Decker and Representative Wood and if he would ask other chiropractors to do the same. Id. at 63. Dr. Willen wrote a $1,000 check to Decker and a $1,000

17

check to Wood and asked three others chiropractors to do the same. Id.

Agent Myers also described interviewing Dr. Brown. Id. at 64. Dr. Brown told Agent Myers that he gave $4,000 in cash to Black on February 12, 2002, $2,000 in cash to Black on December 12, 2002, and a $4,000 check made payable to "Jim Black" to Black on February 14, 2004. Id. at 65-66.

Dr. Brown also told Agent Myers about a conversation he had with Black regarding the $4,000 check. Id. at 66. Dr. Brown said that in December 2005, Dr. Keith called and said Black was in Dr. Keith's office and wanted to talk to Dr. Brown. Id. at 67. Dr. Brown went to Dr. Keith's office. Id. Black told Dr. Brown that he (Black) had deposited the $4,000 into one of his personal accounts. Id. Black asked Dr. Brown to state, if asked about the check, that Dr. Brown had written the check to Black to help with expenses. Id.

Agent Myers also testified about his interview of four Womble Carlyle lawyers who contributed checks to Representatives Decker and Wood in early 2003 after a request from Black (or his office) to do so. Id. at 67-68. Decker negotiated the checks made out to him. Wood did not. Id. at 68.

Agent Myers then recounted his interview of Representative Wood. Id. at 68-69. Wood stated that Black contacted him on February 4, 2003, and asked to meet him on the morning of February 5, 2003, at the Red Roof Inn in Raleigh. Id. at 69. Wood went to meet with Black on the morning of February 5, 2003, and was surprised to find Decker there. Id. According to Wood, Black made a last pitch to have Wood vote for Black so that Black could be Speaker and not have to share a co-speakership. Id. Wood declined. Id.

Finally, the State introduced an exhibit with a timeline from January 2002 to January 2006. The exhibit shows the amount and dates that Dr. Willen, Dr. Keith, and Dr. Brown gave money to

Black. Id. at 70.

At the conclusion of Black's arraignment, Judge Stephens stated:

> Based upon the statements of counsel and the statements of the defendant in response to my questions asked, based upon the presentation of the evidence presented, **although Michael Decker's credibility may be subject to question, when you tie together his plea and his statements, his plea against his own interest, and his statements in light of all the circumstantial evidence surrounding these events, the circumstantial evidence is significant and very strong in support of his statements, and therefore the court finds there is a significant and strong and substantial factual basis for the entry of this plea on behalf of the State**, its evidence.

> The court finds that the defendant is satisfied with his lawyer – and I say "factual basis" **I mean there is significant and substantial and strong factual evidence of actual guilt to the charges** – the defendant is satisfied with his lawyer and his lawyer's legal services. He is certainly competent to stand trial.

> The court finds that the plea of guilty, although under North Carolina versus Alford, is one that the defendant has freely, voluntarily and understandingly made of his made of his own free will; it is his choice; is rational.

> The court finds and accepts the plea as appropriate and orders it be recorded

. . . .

> Pursuant to the plea arrangement, the court having accepted the plea, orders it be recorded, the agreement being that the matter would be continued until a date later set at the convenience of the parties in which the state will pray judgment and the court will enter such sentence as appropriate after the defendant has had a full opportunity to cooperate with the ongoing investigation consistent with the agreement that he has signed as embodied in the letter from the District Attorney, let judgment be continued until the matter is calendared for entry of judgment.

Id. at 84-85 (emphasis added). In accordance with the state-court plea agreement, Black's state-court sentencing was "delayed for a reasonable period of time to permit the defendant to cooperate, and to allow the defendant to be sentenced in Federal Court prior to being sentenced in State Court." Id., Tr. of Plea, Attach. at 2 (Letter from Wake County District Attorney (Feb. 16, 2007)).

D.

As this court prepared for the April 27, 2007, sentencing hearing involving Decker, the court

19

received a presentence report concerning Decker. On April 11, 2007, in accordance with Fourth Circuit precedent, the court issued an order to the parties giving notice that it was contemplating a possible upward departure under the sentencing guideline and/or a "variance" sentence. Decker, No. 5:06-CR-197-1-D, Order (E.D.N.C. Apr. 11, 2007); see Fed. R. Crim. P. 32(h); United States v. Davenport, 445 F.3d 366, 370 (4th Cir. 2006); United States v. Moreland, 437 F.3d 424, 432-37 (4th Cir. 2006). The court also established deadlines for the submission of memoranda or other material regarding sentencing. At the time that the court issued its order, the court had made no determination as to what Decker's advisory guideline range would be, whether to depart, whether to vary, or what Decker's sentence would be. There were no objections to the presentence report.

On April 27, 2007, the court held a sentencing hearing concerning Decker. See Decker, No. 5:06-CR-197-1-D, Tr. (E.D.N.C. Apr. 27, 2007). The court proceeded during the hearing in accordance with the process that the Fourth Circuit mandates. See, e.g., Davenport, 445 F.3d at 370; Moreland, 437 F.3d at 432-37. Initially, the court heard from counsel for the United States and defense counsel. After considering their arguments, the court determined a total offense level of 21 and a criminal history category of I. See Decker, No. 5:06-CR-197-1-D, Sentencing Order 7-12 (E.D.N.C. Apr. 27, 2007). This determination yielded an advisory guideline range of 37 to 46 months imprisonment. See id. at 12.

The court then considered whether an upward departure was appropriate. After listening to counsels' arguments, the court found that an upward departure was appropriate under application note 7 to U.S.S.G. § 2C1.1, U.S.S.G. § 5K2.0, and/or U.S.S.G. § 5K2.7. See id. at 12-18. In accordance with Fourth Circuit precedent, the court then determined the extent of the departure. Id. Following that analysis and in light of the five-year statutory maximum under 18 U.S.C. § 371, the court found the advisory guideline range to be 60 months. Id.

In accordance with Fourth Circuit precedent, the court then considered the government's motion under U.S.S.G. § 5K1.1 for a downward departure based on Decker's substantial assistance. After receiving evidence, the court granted the government's motion. See id. at 19-20.

At that point, in accordance with Fourth Circuit precedent, the court heard from Decker's counsel, heard from Decker, and heard from government counsel. The court credited Decker's statements as to his criminal conduct in the conspiracy and his sincere remorse. After fully considering the matter, the court sentenced Decker to 48 months and imposed a $50,000 fine. See id. at 20-24. The court filed an order in open court concerning Decker's sentencing. See id.

Nothing that the court said or did in connection with any part of Decker's case was based on information from any extrajudicial source. See, e.g., Liteky v. United States, 510 U.S. 540, 555 (1994); 28 U.S.C. § 455(b).

E.

On April 30, 2007, the court published its calendar for the May 14, 2007, term of court. On that calender, Black was notified that his sentencing hearing would take place on May 18, 2007. On May 1, 2007, in accordance with Fourth Circuit precedent, the court issued an order giving notice to the parties that it was contemplating a possible upward departure under the sentencing guidelines and/or a "variance" sentence. Black, No. 5:07-CR-42-1-D, Order (E.D.N.C. May 1, 2007); see Fed. R. Crim. P. 32(h); Davenport, 445 F.3d at 370; Moreland, 437 F.3d at 432-37. The court also established deadlines for the submission of memoranda or other material concerning the sentencing. Black, No. 5:07-CR-42-1-D, Order (E.D.N.C. May 1, 2007). At the time that the court issued its order, the court had made no determination as to what Black's advisory guideline range would be, how the court would resolve objections to the presentence report, whether to depart, whether to vary, or what Black's sentence would be.

Nothing that the court said or did in connection with any part of Black's case was based on information from any extrajudicial source. See, e.g., Liteky, 510 U.S. at 555; 28 U.S.C. § 455(b).

F.

On May 3, 2007, Black filed a motion to recuse based on 28 U.S.C. §§ 455(a), 455(b)(1), and 455(b)(2). On May 4, 2007, the court cancelled the sentencing hearing scheduled for May 18, 2007, and suspended the deadlines for submitting anything concerning Black's sentencing. See Black, No. 5:07-CR-42-1-D, Order (E.D.N.C. May 4, 2007). The court also advised the parties of its heavy criminal docket during May and that the court would resolve the motion to recuse in due course. Id. Lastly, the court advised the United States that if it wished to file a response to defendant's motion to recuse, any response was due on May 11, 2007. Id. On May 11, 2007, the United States filed a response in opposition to the motion to recuse. On May 11, 2007, the defendant filed a motion to supplement his motion to recuse.

II.

Section 455 contains various grounds for a federal judge's recusal and is divided into two parts. See 28 U.S.C. § 455. Section 455(b) addresses specific scenarios where recusal is required. See id. § 455(b). Subsection (b)(1) requires recusal "[w]here [a judge] has . . . personal knowledge of disputed evidentiary facts concerning the proceeding." Id. § 455(b)(1). Subsection (b)(2) requires recusal "[w]here in private practice [a judge] served as lawyer in the matter in controversy, or a lawyer with whom he previously practiced law served during such association as a lawyer concerning the matter . . . ." Id. § 455(b)(2); see Liteky, 510 U.S. at 547-48. In contrast to section 455(b), section 455(a) is a "catchall" recusal provision, which states: "any [federal judge] shall disqualify himself in any proceeding in which his impartiality might reasonably be questioned." 28 U.S.C. § 455(a); see Liteky, 510 U.S. at 548. Initially, the court analyzes defendant's arguments under section

22

455(b), and then analyzes his arguments under section 455(a). See Schurz Commc'ns, Inc. v. FCC, 982 F.2d 1057, 1061 (7th Cir. 1992).

A.

Before addressing the merits, the court examines whether defendant's motion is timely. In his motion to recuse, Black asserts that "[s]hortly before filing this motion, counsel for Black learned that Judge Dever, while in private practice, represented some of Black's most outspoken political opponents, prominent Republican members of the North Carolina General Assembly and the North Carolina Republican Party Chairman, in redistricting litigation impacted by the allegations in Black's and Decker's case." Def.'s Mot. to Recuse at 10; see also id. at 13.

In response, the United States notes that Black's motion to recuse came just six days after Decker's sentencing and two days after the court entered an order notifying the parties that it was contemplating a possible upward departure or variance sentence. See U.S. Resp. at 3. The United States then argues that a "hypothetical reasonable person" that is a well-informed observer who assesses "all the facts and circumstances" pursuant to United States v. DeTemple, 162 F.3d 279, 286 (4th Cir. 1998), would likely conclude "that these developments have motivated the defendant's motion to recuse and not the supposedly recently acquired knowledge of Judge Dever's participation in redistricting litigation while in private practice." U.S. Resp. at 3.

"Timeliness is an essential element of a recusal motion." United States v. Owens, 902 F.2d 1154, 1155 (4th Cir. 1990). To be timely, a recusal motion must be made at the "first opportunity after discovery of the facts tending to prove disqualification." Sine v. Local No. 992 Int'l Brotherhood of Teamsters, 882 F.2d 913, 915-16 (4th Cir. 1989) (analyzing 28 U.S.C. § 144); see Satterfield v. Edenton-Chowan Bd. of Ed., 530 F.2d 567, 574 (4th Cir. 1975). The timeliness requirement "serves to deter not only delay, but also 'wait and see' tactics." United States v.

23

Taggart, 1993 WL 10876, at *3 (4th Cir. Jan. 21, 1993) (per curiam) (unpublished).

The Fourth Circuit has found section 455 motions untimely when criminal defendants challenged the judges' impartiality after unfavorable sentencing decisions on grounds essentially known to them before the decisions. See Owens, 902 F.2d at 1155-57; Taggart,1993 WL 10876, at *1-3. Black and his counsel have known since February15, 2007, that I was assigned as the district judge to handle this criminal action. Black was arraigned on that date and released. For the next 76 days, Black and his counsel did not seek recusal. Only after Decker was sentenced on April 27, 2007, and only after this court issued its order of May 1, 2007, did Black (through counsel) file his motion to recuse. Further, the motion to recuse is based, inter alia, on two published 2002 and 2003 North Carolina Supreme Court decisions, briefs publicly filed in redistricting litigation where I served as counsel, and my publicly available Senate Judiciary Committee questionnaire. As the Seventh Circuit observed in connection with a motion to recuse a district judge for her prior work as an Assistant U.S. Attorney, "[f]ar from being a secret, [all of these things are] a matter of public record." United States v. Ruzzano, 247 F.3d 688, 694 (7th Cir. 2001).

It appears that Black was content "to test the waters" for 76 days, but viewed "the waters" as "uncomfortably hot" after Decker's sentencing on April 27, 2007, and after receiving this court's order of May 1, 2007. See Owens, 902 F.2d at 1155. Nonetheless, Black has not participated in substantial trial or pre-trial proceedings. Rather, he appeared and pleaded guilty on February 15, 2007. Further, the motion was not made after a trial or after entry of judgment in his case. Even though there does not appear to be good cause for Black's delay in filing the motion, this court will not base its decision on timeliness. See Schurz Comm'ns, Inc., 982 F.2d at 1061. Thus, the court turns to the merits of Black's recusal motion.

B.

Citing section 455(b)(2), Black argues that I must recuse because the November 2001

Stephenson redistricting lawsuit and his February 2007 criminal prosecution for accepting money

from chiropractors in violation of 18 U.S.C. § 666(a)(1)(B) are the same "matter in controversy."

Def.'s Mot. to Recuse 20.[6] He asserts that both the Stephenson redistricting litigation and his federal

criminal case raise the "same fundamental question," namely: "whether Democratic legislators

(including Black) used improper means to manipulate election results to maintain a Democratic

majority and secure Black's position as Speaker of the House." Id.

1.

In order to assess Black's argument, the court initially describes the Stephenson redistricting

litigation. The Stephenson litigation began in November 2001 when five registered Republican

voters (including then-Representative Art Pope, then-Representative Leo Daughtry, then-Senator

Patrick Ballantine, and then-Chairman of the North Carolina Republican Party Bill Cobey) filed a

civil lawsuit naming the Executive Director of the State Board of Elections, the five members of the

State Board of Elections, the Speaker of the House, the President Pro Tempore of the Senate, the

Governor, and the Attorney General. See Stephenson I, 355 N.C. at 354, 562 S.E.2d at 377. My

former law partner Thomas Farr and I represented the plaintiffs. The lawsuit named these ten

defendants only in their official capacity. Of course, when a state officer is named as a defendant

in his official capacity, the party suing is not seeking relief "against [the defendant] personally, but

against the Government." Cheney v. U.S. Dist. Court for the Dist. of Columbia, 541 U.S. 913, 917

---

[6]Section 455(b)(2) requires recusal "[w]here in private practice [a federal judge] served as
a lawyer in the matter in controversy, or a lawyer with whom he previously practiced law served
during such association as a lawyer concerning the matter . . . ." 28 U.S.C. § 455(b)(2).

(2004) (Scalia, J.); In re Mason, 916 F.2d 384, 387 (7th Cir. 1990) ("Any doubts about the judge's impartiality are especially weak because the complaint names [defendants] in their official rather than personal capacities."). In official-capacity actions, "federal [and North Carolina] law provides for automatic substitution of the new officer when the originally named officer has been replaced." Cheney, 541 U.S. at 917 (emphasis omitted) (citing Fed. R. Civ. P. 25(d)(1); Fed. R. App. P. 43(c)(2); S. Ct. R. 35.3); see N.C. R. Civ. P. 25(f); N.C. R. App. P. 38(c).

The plaintiffs' Stephenson lawsuit challenged the November 2001 redistricting statute concerning state House and Senate legislative districts and sought an injunction to prevent its enforcement. Plaintiffs argued that the November 2001 redistricting statute violated a "harmonized" interpretation of the whole county provisions in Article II, Sections 3(3) and 5(3) of the North Carolina Constitution. See Stephenson I, 355 N.C. at 358, 562 S.E.2d at 381. In February 2002, the state trial court held that the November 2001 redistricting statute was unconstitutional under a harmonized interpretation of the North Carolina Constitution. Id. at 358-59, 562 S.E.2d at 382. The state trial court's interpretation of the whole county provision harmonized the North Carolina Constitution with federal law, including the Voting Rights Act and the U.S. Constitution's one-person, one-vote requirement. Id. at 359, 562 S.E.2d at 382. On April 30, 2002, the Supreme Court of North Carolina held that the November 2001 redistricting statute was unconstitutional under the North Carolina Constitution and enjoined its use. The Supreme Court remanded the case to the state trial court for remedial proceedings. Id. at 375-85, 562 S.E.2d at 392-98.

After remand, the General Assembly enacted another redistricting statute ("May 2002 redistricting statute"). In May 2002, the trial court reviewed the May 2002 redistricting statute, held that it did not comply with Stephenson I, and enjoined its use. See Stephenson II, 357 N.C. at 303-04, 582 S.E.2d at 249. Using its remedial equitable powers, the state trial court then developed

26

interim House and Senate redistricting plans and ordered that, after preclearance, these interim plans ("trial court's 2002 interim plans") be used in the 2002 elections. Id. at 304, 582 S.E.2d at 249. The November 2002 House and Senate elections were conducted using the state trial court's 2002 interim plans. Id., 582 S.E.2d at 249.

In approximately late March or early April 2003, Thomas Farr left my old law firm and joined another law firm in Raleigh. At the time, the State's 2002 appeal in Stephenson II was pending in the Supreme Court of North Carolina. Thomas Farr had been lead counsel in Stephenson and retained that role after leaving my old firm. On July 16, 2003, the Supreme Court of North Carolina affirmed the state trial court's May 2002 determination that the May 2002 redistricting statute violated the North Carolina Constitution and affirmed the trial court's remedy. See id. at 313, 582 S.E.2d at 254.

Nowhere – except in the case caption in Stephenson I and Stephenson II – does the Supreme Court's 2002 or 2003 decision mention Black. Moreover, nowhere in the case was there ever any allegation, evidence, or issue of criminal wrongdoing by anyone. Rather, the litigation is the type of civil, official-capacity redistricting litigation that takes place in numerous states following the decennial census. The focus of such litigation (including in Stephenson) is whether a given redistricting statute (i.e., a statute creating the boundaries of legislative districts) meets the governing legal criteria. If the statute meets the legal criteria, then the court upholds it. If the statute does not, then the statute is invalidated. The focus in such litigation is not on the official-capacity defendants and was not on any of them in Stephenson I or Stephenson II.

I left my old law firm and was appointed to the federal bench on February 9, 2004. As stated in my questionnaire submitted to the United States Senate Judiciary Committee as part of my nomination to be a United States District Judge, Stephenson was among the ten most significant

27

cases that I personally handled while in private practice. See Def.'s Mot. to Supplement Mot. to Recuse, Ex. A, part III, p. 112. In describing the Stephenson litigation in the questionnaire, however, I did not mention any of the official-capacity defendants by name, including Black. See id., pp. 110-14. The focus of the Stephenson litigation concerned whether the redistricting statute complied with the North Carolina Constitution. See id.

2.

In support of his argument under section 455(b)(2), Black cites In re Rodgers, 537 F.2d 1196 (4th Cir. 1976) (per curiam). See Def.'s Mot. to Recuse 20. Rodgers involved six defendants, including a former Maryland governor. Rodgers, 537 F.2d at 1197. The indictment alleged that the defendants used unlawful means to secure the passage of a bill in the Maryland legislature concerning horse-racing tracks. Id. at 1197-98. After the bill passed, some of the defendants acquired an interest in Marlboro race track. The indictment alleged that getting the bill passed and acquiring the Marlboro race track were part of a corrupt scheme. See United States v. Mandel, 591 F.2d 1347, 1353-54 (4th Cir. 1979), aff'd, 602 F.2d 653 (4th Cir. 1979) (en banc) (per curiam). The defendants pleaded not guilty and were going to trial. Rodgers, 537 F.2d at 1197.

Before trial, defendants sought recusal of the trial judge under section 455(b)(2) because when the judge was in private practice, his law partner represented Pimlico race track, which was lobbying to get the same bill passed. The judge's former partner also prepared an offer for Pimlico race track to buy Marlboro race track. Id. After the bill passed, the owners of Marlboro rejected the Pimlico offer, and Marlboro was sold to a group which included some of the defendants. At trial, the defendants planned to argue as a defense that their conduct concerning the bill at issue in the indictment was no more culpable than that of Pimlico. Id. at 1198. The defendants intended to call the judge's former law partner and his client as witnesses at the trial. Id. The testimony of both

28

witnesses would be intended to show "that the conduct for which [defendants] have been indicted was no more culpable than the conduct of the client represented by the judge's former law partner." Id.

The Fourth Circuit held that "the actual case before the court consists of more than the charges brought by the government. It also includes the defense asserted by the accused. Here, this defense, in part at least, will consist of evidence of matters in which the judge's former partner served as lawyer." Id. Because of this anticipated defense to the charge, the Fourth Circuit held that the "former partner's representation of [the race track] with respect to the [bill at issue in the indictment and the sale of the race track at issue in the indictment] and his preliminary work for the attempted purchase of [the race track] before the judge withdrew from the firm is a matter in controversy within the meaning of 28 U.S.C. § 455(b)(2)." Id. at 1198 (footnote omitted). Accordingly, the Fourth Circuit ordered recusal.

Black concedes that Rodgers "is not directly on point," but argues that the holding in Rodgers is broad enough to include "related matters" that have a "reasonable connection" to the instant case. Def.'s Mot. to Recuse 20. The Fourth Circuit's decision in United States v. DeTemple, 162 F.3d 279 (4th Cir. 1998), forecloses Black's interpretation of "matter in controversy" in section 455(b)(2).

In DeTemple, the court distinguished Rodgers and held that the "matter in controversy" requirement under section 455(b)(2) was not met. Id. at 284. DeTemple was charged in a twenty-count federal indictment in September 1993 with arson, mail fraud, and bankruptcy fraud relating to his personal bankruptcy. Id. at 282. The case was assigned to a district judge appointed to the federal bench in July 1990. Id. Defendant pleaded not guilty and went to trial. Before trial, he filed a motion to recuse the district judge under sections 455(a), 455(b)(1), and 455(b)(2). As to section 455(b)(2), defendant argued for recusal based on legal work done by the judge and legal work done

by two of the judge's former law partners. Id. at 282-86. The district judge denied the motion to recuse, and the Fourth Circuit affirmed. Id.

As to the district judge's prior legal work, the judge (while a lawyer) wrote four letters to the defendant on behalf of Contractors Supply, Inc. ("Contractors Supply") seeking to collect a debt that defendant owed to Contractors Supply. Id. at 282. The judge wrote these four letters in 1987 and 1988. Id. Defendant did not pay the debt. In November 1989, the defendant filed for personal bankruptcy and identified Contractors Supply as one of his unsecured creditors. Id.

Defendant relied on Rodgers and argued that the district judge's representation of Contractors Supply constituted service "as a lawyer in the matter in controversy" with respect to the September 1993 bankruptcy fraud indictment. Id. at 284 (discussing 28 U.S.C. § 455(b)(2)). The Fourth Circuit stated that the bankruptcy fraud prosecution "clearly implicated the interests of the bankruptcy creditors, including Contractors Supply. Had [defendant's] bankruptcy fraud gone undiscovered, Contractors Supply would have been one its victims . . . . Thus, by fraudulently understating his assets, [defendant] arguably increased the chances that Contractors Supply would receive a smaller payment, or no payment at all, upon distribution." Id. at 284. Nonetheless, the Fourth Circuit rejected defendant's reliance on Rodgers and rejected his expansive interpretation of "matter in controversy" in section 455(b)(2). See id. The Fourth Circuit held that the debt that the defendant owed to Contractors Supply played no role in either the prosecution or defense of his federal charges. Id. "The connection between the Judge's prior professional associations and the case before him is far more tenuous here than in Rodgers." Id.

As for the work of the judge's former law partners, one former law partner represented the defendant's ex-wife in her divorce proceeding against the defendant while the judge was in practice. Id. at 285. The ex-wife testified at defendant's criminal trial, but the Fourth Circuit held that the

divorce case was not a "matter in controversy" in defendant's criminal trial. Id.

Another former law partner had represented a local bank in connection with its sale of certain real property to defendant's parents. Id. The attempted arson of the real property "provided the basis for Count One of the indictment . . . ." Id. Moreover, at trial, the government argued that the defendant's parents were "straw purchasers" of the real property for defendant. Id. Further, defendant contended that if the alleged arson had gone as planned, then the bank (as primary lienholder of the real property) would have received the insurance proceeds. Id.

The Fourth Circuit held that although the particulars of the real property sale did play "a part" in the criminal case against defendant, defendant failed to show that the sale of the real property "concerned the case against him in more than a very tangential way." Id. In reaching this conclusion, the Fourth Circuit noted that the connection between the judge's former law partner's representation of the bank was "far more remote than the connection between the judge and the crime victim in United States v. Sellers, 566 F.2d 884 (4th Cir. 1977)." DeTemple, 162 F.3d at 285-86. In Sellers, defendant was convicted of bank robbery. He then sought a new trial and recusal of the district judge because the judge held stock in the holding company that owned the bank and the bank's chairman and chief executive officer was the judge's brother. Nonetheless, in Sellers, the Fourth Circuit did not order recusal. Sellers 566 F.2d at 887; see DeTemple, 162 F.3d at 286.

In DeTemple, the Fourth Circuit held that any connection between the judge's law partner's representation concerning the real property at issue in count one of the indictment and the criminal matter was "too attenuated to be considered the same matter in controversy." DeTemple, 162 F.3d at 286. Accordingly, the Fourth Circuit affirmed the district judge's refusal to recuse under section 455(b)(2). Id.

As with the four letters that the district judge wrote to the defendant in DeTemple, the

Stephenson redistricting litigation played no role in Black's federal criminal case. See id. at 284. Black's federal criminal information and the government's factual basis do not mention the Stephenson redistricting litigation. See Black, No. 5:07-CR-42-D, Crim. Inf. (E.D.N.C. Feb. 15, 2007). Moreover, the Stephenson redistricting litigation was not mentioned at his arraignment. See id., Arraignment (E.D.N.C. Feb. 15, 2007). Rather, Black's federal criminal information concerns Black's criminal conduct that took place between 2000 and 2005. That criminal conduct consisted of soliciting and accepting money from chiropractors, "intending to be rewarded in connection with business of . . . state government involving things of value more than $5,000." Id., Crim. Inf. (E.D.N.C. Feb. 15, 2007). Likewise, although Black's criminal history is relevant and his criminal history includes his two convictions in Wake County Superior Court, the redistricting litigation also played no role in Black's two state court convictions. See Black, 07CRS10444, Inf. (Wake County Super. Ct. Feb. 20, 2007); DeTemple, 162 F.3d at 284.

There are numerous other distinctions between Black's case and Rodgers. Unlike the defendants in Rodgers, Black pleaded guilty. Additionally, unlike Rodgers, Black has not suggested that my former law partner or former clients in Stephenson have any relevant evidence to offer concerning Black's federal criminal case. As in DeTemple, where the judge's letters to defendant about Contractors Supply played no role in the prosecution or defense of defendant for bankruptcy fraud, the same holds true for my legal work in the Stephenson redistricting litigation. See DeTemple, 162 F.3d at 284; see also Schurz Commc'ns, Inc., 982 F.2d at 1060-61; Patterson v. Masem, 774 F.2d 251, 254 n.2 (8th Cir. 1985); Chitimacha Tribe v. Harry L. Laws Co., 690 F.2d 1157, 1166 (5th Cir. 1982).

As for the work of my former law partner in the Stephenson redistricting litigation, that legal work is not the same "matter in controversy" as Black's federal criminal case. See 28 U.S.C. §

32

455(b)(2). Unlike the real property transaction described in count one of the indictment in DeTemple, which played "a part" in a very "tangential way" in DeTemple's federal criminal case, my former partner's legal work in Stephenson did not play any part in Black's federal criminal case. See DeTemple, 162 F.3d at 285-86.

Finally, the court rejects Black's argument that the Stephenson redistricting litigation and his federal criminal case raise the "same fundamental question," namely: "whether Democratic legislators (including Black) used improper means to manipulate election results to maintain a Democratic majority and secure Black's position as Speaker of the House." Def's Mot. to Recuse 20. Indeed, Black's argument impugns all of his honest and honorable former colleagues in the General Assembly and ignores the fact that Black pleaded guilty to a felony in this court on February 15, 2007, and pleaded guilty to two felonies in state court on February 20, 2007. Black's federal criminal case is about Black's criminal conduct set forth in his federal criminal information. Likewise, Black's state criminal case is about Black's criminal conduct set forth in his state criminal information. Black's criminal cases are not about redistricting or about his former colleagues.

In sum, I did not serve as a lawyer in the "matter of controversy" under section 455(b)(2), and no lawyer with whom I previously practiced did so. Accordingly, recusal is not required under section 455(b)(2). See, e.g., DeTemple, 162 F.3d at 284-86.

## C.

Next, Black argues that section 455(b)(1) requires recusal because I may have gained "personal knowledge of disputed evidentiary facts" concerning his federal criminal case through my involvement as a lawyer in the Stephenson redistricting litigation. Def.'s Mot. to Recuse 21-22. In making this argument, Black notes that, when sentencing Decker, the court applied an upward departure under application note 7 of U.S.S.G. § 2C1.1 for "systematic or pervasive corruption of

33

a governmental function." Further, he notes that on May 1, 2007, the court notified the parties that it was considering an upward departure under, inter alia, application note 7 of U.S.S.G. § 2C1.1 in Black's case. Id.; see Black, No. 5:07-CR-42-1-D, Order (E.D.N.C. May 1, 2007). Black then asserts that, in considering whether section 2C1.1 applies to Black,

> Judge Dever may be tempted to consider information he learned about Black while serving opposite him in the redistricting litigation – namely evidence which allegedly suggests Black has engaged in a series of successive actions designed to manipulate the results of state elections, all to ensure a Democratic majority and maintain his position as Speaker of the House.

Def.'s Mot. to Recuse 21.

In support of his section 455(b)(1) argument, Black cites Wessmann v. Boston Sch. Comm., 979 F. Supp. 915 (D. Mass. 1997). In Wessmann, Judge Gertner recused herself from a desegregation case involving Boston schools. Id. at 918-19. In an earlier desegregation case involving Boston schools, then-lawyer Gertner had represented the Concerned Black Educators of Boston ("CBEB") as an intervenor. Id. at 915. Wessmann required Judge Gertner to interpret the injunction that was imposed as a result of the earlier case involving CBEB. Id. at 918. Additionally, the defendant in Wessmann stated that it might present evidence on a "key issue" in the earlier case, namely, "the deleterious effects of a racial imbalance in the Boston Schools' teaching staff on minority student performance." Id. Because the defendant had "indicated a direct relationship between the earlier case and the Wessmann matter" and Judge Gertner believed that the present case "may involve disputed facts with which I may have personal knowledge by virtue of my prior representation," Judge Gertner recused herself. Id.

Unlike Judge Gertner in Wessmann, I gained no "personal knowledge of disputed evidentiary facts concerning [Black's] proceeding" during the redistricting litigation. See 28 U.S.C. § 455(b)(1). Further, whatever information I learned in connection with my judicial duties during the Decker

34

criminal case or the Black criminal case cannot form the basis of a motion to recuse under section 455(b)(1). See, e.g., Liteky, 510 at 551-52; United States v. Parker, 742 F.2d 127, 128 (4th Cir. 1984); Greenville County Sch. Dist. v. U.S. Gypsum Co., 1987 WL 38165, at *5-6 (4th Cir. Oct. 5, 1987) (per curiam) (unpublished). Rather, the disqualifying source of knowledge must come from an extrajudicial source.

As for Wessmann, Black's case has not and will not require me to interpret the injunctive relief ordered in Stephenson I, Stephenson II, or any other case in which I served as a lawyer. Moreover, the key issue in the redistricting litigation – whether the November 2001 redistricting statute or the May 2002 redistricting statute complied with the North Carolina Constitution – has no relevance to Black's federal criminal case, including whether Black may have engaged in systematic or pervasive corruption of a governmental function under application note 7 of section 2C1.1 ("application note 7") or section 5K2.7 with respect to the federal criminal charge to which Black pleaded guilty on February 15, 2007. The same conclusion holds true with respect to a possible upward departure under section 5K2.0 arising from that federal criminal charge.[7]

To the extent that this court would consider an upward departure with respect to application note 7 or section 5K2.7 at Black's sentencing, such an upward departure would relate solely to the nature, extent, and importance of the "governmental function" that may have been or was disrupted by the conduct set forth in Black's February 15, 2007, criminal information or the government's

---

[7]Application note 7 states that when "the defendant's conduct was part of a systematic or pervasive corruption of a governmental function, process, or office that may cause loss of public confidence in government, an upward departure may be warranted." U.S.S.G. § 2C1.1 cmt. n.7. Section 5K2.0 provides that a district court may depart from the guidelines where it determines that there exists "an aggravating circumstance[] of a kind or to a degree not adequately taken into consideration" by the guidelines. Id. § 5K2.0. Section 5K2.7 authorizes an upward departure for significant disruption of a governmental function. Id. § 5K2.7.

February 15, 2007, factual basis.[8] Such an evaluation would include determining whether such a disruption may have occurred or did occur. Cf., e.g., Black, No. 5:07-CR-42-1D, Factual Basis ¶ 3b (E.D.N.C. Feb. 15, 2007). Whether any such upward departure would be appropriate must await evidence and argument. This court has no "personal knowledge of disputed evidentiary facts concerning" such issues. See 28 U.S.C. § 455(b)(1).

To the extent this court would consider an upward departure with respect to section 5K2.0 at Black's sentencing, such an upward departure would relate solely to the conduct set forth in Black's February 15, 2007, criminal information or the government's February 15, 2007, factual basis. Whether any such upward departure would be appropriate must await evidence and argument. This court has no "personal knowledge of disputed evidentiary facts" concerning such issues. See id. § 455(b)(1).

As for Black's reference to the upward departure in Decker's case under application note 7, Decker pleaded guilty to a different crime than Black. Decker pleaded guilty to violating 18 U.S.C. § 371. Black pleaded guilty to violating 18 U.S.C. § 666(a)(1)(B). Although in sentencing Decker this court obviously credited Decker's version of the conspiracy to which he pleaded guilty, this court does not view that conspiracy (including the bribe) as "relevant conduct" for purposes of Black's guideline calculation under Chapters 2 and 3 of the guidelines. See, e.g., U.S.S.G. § 1B1.3(a); United States v. Dugger, 2007 WL 1345826, at *4-5 (4th Cir. May 9, 2007). In reaching this conclusion, the court has reviewed Black's April 10, 2007, presentence report ("PSR"), the

---

[8]In light of this court's disposition in Part IV of this order, the court recognizes that its views on any of the legal issues at sentencing are dicta. Part IV, however, is not based on section 455(b)(1). Moreover, as in Wessmann, this court believes that an analysis of section 455(b)(1) requires a court to look prospectively to anticipated evidentiary issues in order to assess whether recusal is required under section 455(b)(1).

36

parties' objections, and conducted its own legal research.[9] Although this conclusion is dicta on the legal issue at sentencing in light of Part IV of this order, the court believes that such a review was necessary to assess Black's argument under 28 U.S.C. § 455(b)(1).

The PSR calculates Black's base offense level using section 2C1.1. See PSR ¶ 39. Both Black and the United States object to using section 2C1.1 to calculate the base offense level. The court has reviewed the cases that the parties cited in their objections, conducted its own research, and agrees with the objections. Thus, in accordance with Appendix A's reference to 18 U.S.C. § 666(a)(1)(B), the cross reference to section 2C1.1 or 2C1.2, and precedent, this court believes that section 2C1.2 would be the appropriate starting point to determine Black's base offense level. Further, in analyzing sections 2C1.2(b)(1), 2C1.2(b)(2), and 2C1.2(b)(3), this court's analysis would focus solely on the government's February 15, 2007, criminal information and factual basis. This court has no "personal knowledge of disputed evidentiary facts" concerning such issues. See 28 U.S.C. § 455 (b)(1).[10]

As for the analysis under sections 3B1.1(a), 3C1.1, and 3E1.1 set forth in the PSR, this court's analysis would focus solely on the government's February 15, 2007, criminal information and factual basis. This court has no "personal knowledge of disputed evidentiary facts" concerning such issues. See id.

After completing its analysis under Chapters 2 and 3 of the guidelines, this court would then

_____

[9]For purposes of the record, the court orders that the April 10, 2007, presentence report, Black's objections of April 24, 2007, and the government's objections of April 24, 2007, all be placed in the record under seal.

[10]Even if this court did view section 1B1.3(a) differently and did view section 2C1.1 as the appropriate starting point for the analysis, the court still finds that it has no "personal knowledge of disputed evidentiary facts" concerning these issues or any other issues pertaining to Black's case. See 28 U.S.C. § 455(b)(1).

assess defendant's criminal history under Chapter 4 of the guidelines. In determining Black's criminal history, this court would have to determine how to account for Black's two guilty pleas under <u>Alford</u> in state court. This court has no "personal knowledge of any disputed evidentiary facts" concerning Black's two guilty pleas and convictions in state court. <u>See id.</u> Moreover, in this court's view, Black's two felony convictions in state court do not appear to be disputed evidentiary issues for purposes of the advisory guideline calculation. <u>See, e.g.</u>, <u>United States v. Mackins</u>, 218 F.3d 263, 268-70 (3d Cir. 2000) ("[W]e accord [the defendant's] <u>Alford</u> plea the same finality we accord any other 'adjudication of guilt, whether by guilty plea, trial, or plea of nolo contendere.'"); <u>accord</u> <u>United States v. Guerrero-Velasquez</u>, 434 F.3d 1193, 1197-98 (9th Cir. 2006); <u>Abimbola v. Ashcroft</u>, 378 F.3d 173, 180-81 (2d Cir. 2004); <u>United States v. Delgado-Lucio</u>, 2006 WL 1644721, at *3 (10th Cir. June 15, 2006) (unpublished); <u>United States v. Martinez</u>, 30 Fed. Appx. 900, 905 (10th Cir. Feb. 22, 2002) (unpublished).

After this court received evidence and argument from the parties about these issues concerning the offense level and criminal history category, this court would then determine a post-<u>Booker</u> advisory guideline range. <u>See, e.g.</u>, <u>Davenport</u>, 445 F.3d at 371; <u>Moreland</u>, 437 F.3d at 432-37. At that point, this court would consider possible departures (either up or down). <u>See, e.g.</u>, <u>Davenport</u>, 445 F.3d at 371; <u>Moreland</u> 437, F.3d at 432-37. The court already has discussed some of those possible upward departure issues and explained why such possible upward departures would not be for the reasons set forth in the <u>Decker</u> sentencing order. Moreover, at sentencing, this court also possibly would consider whether an upward departure is appropriate for an inadequate criminal history under U.S.S.G. § 4A1.3. <u>See</u> <u>Black</u>, No. 5:07-CR-42-D, Order 1-2 (E.D.N.C. May 1, 2007). However, as the court said in its May 1, 2007, order, before considering that issue, this court would have to receive the "parties' views on how to account for defendant's February 20, 2007, convictions

in Wake County Superior Court referenced in paragraph 20 of the PSR." Id. at 1. This court has no "personal knowledge of disputed evidentiary facts" concerning any of these issues. 28 U.S.C. § 455(b)(1).

As for any downward departure motion by either the United States or Black, this court would analyze any such motion after receiving evidence and hearing the arguments of counsel. This court has no "personal knowledge of disputed evidentiary facts" concerning such issues. See id. Similarly, this court has no "personal knowledge of disputed evidentiary facts" as to issues under 18 U.S.C. § 3553(a) or variance issues.

In sum, the court has considered Black's federal criminal case and considered all issues that it believes would or may arise at sentencing. The court finds that it has no "personal knowledge of disputed evidentiary facts" in Black's federal criminal case. See 28 U.S.C. § 455(b)(1). Accordingly, recusal pursuant to 28 U.S.C. § 455(b)(1) is not required. See DeTemple, 162 F.3d at 285; In re Beard, 811 F.2d 818, 829 n.16 (4th Cir. 1987); Rice v. McKenzie, 581 F.2d 1114, 1115-16 (4th Cir. 1978); see also Schurz Comm'ns, Inc., 982 F.2d at 1061.

III.

Section 455(a) states that a federal judge "shall disqualify himself in any proceeding in which his impartiality might reasonably be questioned." 28 U.S.C. § 455(a). Black asserts two grounds for recusal under section 455(a). First, he argues that a "reasonable observer would believe that Judge Dever would be unable to disregard any knowledge or opinions about Black he obtained as result of his involvement in the redistricting proceedings, or set aside his personal feelings about those proceedings." Def.'s Mot. to Recuse 14. Second, Black argues that "Judge Dever made statements in connection with the redistricting litigation which could lead a reasonable observer to believe he was biased against Democratic legislators generally, and Black in particular." Id. at 17.

39

A.

A court must evaluate a recusal motion under section 455(a) on an objective basis. Microsoft Corp. v. United States, 530 U.S. 1301 (2001) (Rehnquist, J.); Cheney, 541 U.S. at 914; Liteky, 510 U.S. at 548; Liljeberg v. Health Servs. Acq. Corp., 486 U.S. 847, 858-59 (1988). The objective analysis does not focus on the reality of a judge's actual state of mind, purity of heart, incorruptibility, or impartiality. See Liljeberg, 486 U.S. at 858-60. Rather, the focus is on perception (i.e., appearance): whether sufficient factual grounds exist to cause an objective observer reasonably to question the judge's impartiality. See, e.g., Liteky, 510 U.S. at 548-51.

In DeTemple, the Fourth Circuit described a "nuanced approach" to determining when recusal is required under section 455(a)'s objective standard and examined four factors. DeTemple, 162 F.3d at 287-88. First, the court must view the facts and circumstances from the position of a reasonable observer outside the judicial system. See id. "Judges, accustomed to the process of dispassionate decision-making and keenly aware of their Constitutional and ethical obligations to decide matters solely on the merits, may regard asserted conflicts to be more innocuous than an outsider would." Id. However, the reasonable outside observer is not "unduly suspicious or concerned about a trivial risk of bias." Id.

Second, when Congress enacted section 455(a) and adopted an objective standard, Congress abolished the obligation of judges to resolve close questions of disqualification in favor of a judge's "duty to sit." Id. at 286-87. Nonetheless, section 455(a) does not require recusal on the basis of suspicion or "unsupported, irrational, or highly tenuous speculation." Id. at 287 (quotation omitted); see In re United States, 666 F.2d 690, 695 n.* (1st Cir. 1981) (the standard under section 455(a) is not the same standard that Caesar used in dismissing his wife Pompeia after merely suspecting her of having an affair). "To disqualify oneself in such circumstances would be to set the price of

40

maintaining the purity of appearance too high – it would allow litigants to exercise a negative veto over the assignment of judges." DeTemple, 162 F.3d at 287 (quotation omitted).

Third, a unique factual situation is more likely to generate an appearance of partiality than a typically arising potentially biasing circumstance. See id. "[T]he more common a potentially biasing circumstance and the less easily avoidable it seems, the less that circumstance will appear to a knowledgeable observer as a sign of partiality." Id. (quotation omitted).

Finally, a "confluence of facts" can create a reason for reasonably questioning a judge's impartiality, "even though none of those facts, in isolation, necessitates recusal" under section 455(a). Id. at 287. The reasonable outside observer "assesses all the facts and circumstances." Id. at 286 (quotation omitted). To mandate recusal under section 455(a), the question "is simply whether another, not knowing whether or not the judge is actually impartial, might reasonably question his impartiality on the basis of all the circumstances." Id. (quotation omitted). To mandate recusal, however, there must be more than a trivial risk of bias. Id. at 288.

## B.

Black argues that a reasonable outside observer would believe that I would be unable to disregard any information learned and opinions formed during the Stephenson redistricting litigation. Def.'s Mot. to Recuse 14. According to Black, the redistricting litigation and his criminal prosecution involve the "same fundamental allegation," namely: "improper conduct by Democratic decision-makers (specifically, Black) designed to ensure a Democratic majority within the General Assembly, and to allow Black to retain his position as Speaker of the House." Id. at 14-15. Moreover, Black argues that the briefs in the redistricting litigation and the Decker sentencing order describe the "same alleged harm," broadly defined as a loss of public confidence in state government. Id. at 15. Black also cites recent public statements from political commentators

41

(including a newspaper columnist and an unsigned newspaper editorial) asserting that the Decker and Black conspiracy ultimately enabled the General Assembly to pass a redistricting plan in 2003 that favored Democrats. Id. at 16-17.

1.

During the Stephenson redistricting litigation, I did not learn any information about disputed evidentiary facts concerning Black's federal criminal case. See 28 U.S.C. § 455(b)(1). Likewise, I did not form any opinions about Black (or anyone else) in that litigation that would affect my ability to be or to appear to be impartial in this case (or any other). Further, the Stephenson redistricting litigation and Black's federal criminal case are not the same "matter in controversy" under section 455(b)(2). See id. § 455(b)(2).

The connection between the Stephenson litigation and Black's federal criminal case also is too attenuated for a reasonable outside observer, assessing all the facts and circumstances, to conclude that they are so intertwined as to threaten my impartiality. Contrary to Black's argument, the Stephenson redistricting litigation and Black's federal criminal case do not reasonably involve the "same fundamental allegation" or the "same alleged harm." When legislatures adopt redistricting statutes, such statutes invariably produce allegations of partisan maneuvering and often trigger civil legal challenges.[11] These challenges may arise under state constitutions, state statutes, the United States Constitution, or federal statutes. Courts have become accustomed to resolving redistricting disputes, which usually involve complex legal doctrines and technical experts who testify about whether a given redistricting statute satisfies the governing legal criteria. Redistricting litigation is

_____

[11]Redistricting following the 2000 census spawned more than 150 lawsuits in at least 40 states. See Nat'l Conference of State Legislatures, Shifting Sands of Redistricting Law, http://www.ncsl.org/ programs/legman/elect/law-article.htm. As in Stephenson, a significant portion of these lawsuits involved challenges to state legislative redistricting plans. See id.

a form of civil dispute resolution, and such litigation does not involve allegations of criminal wrongdoing. Moreover, the Stephenson litigation never involved any allegation that the November 2001 statute or the May 2002 statute resulted from criminal wrongdoing. Rather, the allegations in the Stephenson litigation always focused on whether the redistricting statutes at issue complied with a harmonized interpretation of the whole county provisions in the North Carolina Constitution.

Neither the 130-page brief the plaintiffs filed in Stephenson I nor the 115-page brief the plaintiffs filed in Stephenson II mention Black in any substantive way. See Def.'s Mot. to Recuse, Exs. A & B; id. Ex. A, part II, p.2 n.20; id., Ex. B. part I, pp. 38-40. The North Carolina Supreme Court mentions Black only in the captions of Stephenson I and Stephenson II.

Further, the harm described in the Stephenson brief is not the "same" harm described in the Decker sentencing order. The passages from one page in the Stephenson brief that Black quotes state that the November 2001 redistricting statute could "produce ongoing and continuous irreparable harm," provide "significant political advantage[s]," and "further heighten cynicism" among voters. Id. at 15. The passages from four different pages in the Decker sentencing order that Black selectively strings together state that the Decker-Black criminal conspiracy "subverted the 2002 general election," "caused a loss of public confidence in North Carolina government," and may cause the General Assembly to "question the legitimacy of certain laws enacted in 2003 and 2004." Id. At its broadest level, any issue involving the government (whether an unconstitutional redistricting statute or a criminal conspiracy involving two lawmakers) implicates good governance concerns and possible voter cynicism. However, focusing on good governance concerns at the broadest level trivializes the profound difference between criminal conduct and non-criminal conduct. Congress and North Carolina criminalized the corrupt conduct described in Decker's criminal information and in the Decker sentencing order, but have never criminalized the enactment of a redistricting statute

43

that fails to comply with federal or North Carolina law. When the North Carolina Supreme Court found that the November 2001 and May 2002 redistricting statutes did not comply with the whole county provisions of the North Carolina Constitution, the remedy was an injunction preventing North Carolina from implementing the redistricting statutes. The official-capacity defendants were not accused of anything illegal or immoral, and nobody faced the prospect of going to prison. See Cheney, 541 U.S. at 920. By contrast, after Decker pleaded guilty to a criminal conspiracy, he faced up to five years imprisonment. See 18 U.S.C. § 371.

As for whether the circumstances concerning the redistricting litigation are unique, DeTemple helps to inform how to assess Black's argument regarding uniqueness. In DeTemple, the district judge had been a lawyer in private practice in Wheeling, West Virginia, before his appointment. DeTemple, 162 F.3d at 282. As a lawyer, he had a general legal practice that included civil and criminal work. See id. at 287. As part of his work, he wrote four dunning letters in 1987 and 1988 to DeTemple on behalf of a client. Id. The judge wrote the last letter in March 1988, and DeTemple was indicted in September 1993. Id. at 284-85. By that time, the lawyer had been confirmed as the lone federal district judge in Wheeling. Id. Wheeling has a population of about 32,000 people, fewer than 300 lawyers, and one federal district court judge. Id. at 287. Wheeling is located in the Northern District of West Virginia ("Northern District"). At the time the Fourth Circuit decided DeTemple, the Northern District had three active federal district judges (one in Wheeling; one in Clarksburg; and one in Martinsburg) and two senior federal district judges (one in Clarksburg; and one in Elkins). See Want's Federal-State Court Directory 112 (Robert S. Want ed., 1998 ed.).

Raleigh is larger than Wheeling, West Virginia. The court takes judicial notice that Raleigh has a population of approximately 275,000 people and the Wake County Bar Association has

44

approximately 2,000 lawyers as members. I am the only active federal district judge in Raleigh, and the Eastern District also has one senior federal district judge in Raleigh. Additionally, the Eastern District has one active federal district judge in Elizabeth City and one in New Bern. The court also has a senior federal district judge in Greenville (who does not take any new criminal cases) and one senior federal district judge in Wilmington.

In <u>DeTemple</u>, the Fourth Circuit held that "[i]t is far more likely in the circumstances [in Wheeling] than it would be in a metropolitan area, that a judge prior to his appointment, might represent a party with some tangential connection to a case subsequently assigned to him." <u>DeTemple</u>, 162 F.3d at 287. In applying <u>DeTemple</u> to Black's motion to recuse, there is not even the tangential connection present in <u>DeTemple</u> between the plaintiffs in the <u>Stephenson</u> litigation and the criminal conduct set forth in Black's federal criminal information or set forth in his state criminal information. Further, countless lawyers in a state capital, such as Raleigh, have either represented a party suing a federal, state, or local official in his or her official capacity or defended such a federal, state, or local official sued in his or her official capacity. <u>Cf.</u> <u>id.</u> ("[W]here, as here, the mere appearance of impartiality is at issue, the likelihood that a given fact will create such an appearance must depend to some extent on how commonly facts of that kind arise.").

Examining the official-capacity defendants in <u>Stephenson</u> highlights why official-capacity litigation in a state capital is not that unique or necessarily disqualifying. In <u>Stephenson</u>, Black's co-defendants in their <u>official capacity</u> included the five members of the Board of Elections and its Executive Director. <u>See</u> <u>Stephenson</u> I, 355 N.C. at 354, 562 S.E.2d at 377. Yet that very same Board of Elections (through its staff headed by the Executive Director) began investigating Black's campaign finances in June 2004 after receiving a complaint from Bob Hall of Democracy North Carolina. <u>See</u> State Tr. 19. That investigation resulted in the Board of Elections holding a hearing

45

in 2006 about Black's campaign finances and ultimately referring a case to the Wake County District Attorney for possible criminal prosecution. Moreover, prior to that 2006 hearing, the SBI joined in the ongoing federal/state joint investigation of Black's campaign finances. See id. at 37. The SBI, of course, is headed by another Black co-defendant sued in his official capacity in the Stephenson litigation – the North Carolina Attorney General. Thus, a reasonable outside observer would understand how common official-capacity litigation is in a state capital and understand that such litigation is not litigation seeking relief against the persons named, but is litigation against the government. See Cheney, 541 U.S. at 917-18; In re Mason, 916 F.2d at 385-87. Further, a reasonable outside observer would understand that when a variety of defendants are named in their official capacity in a civil lawsuit, those defendants are not remotely similarly situated to a group of defendants indicted in a criminal case for engaging in a criminal conspiracy. Rather, just as Black's former official-capacity co-defendants in Stephenson are not necessarily disqualified from doing their jobs simply because a case later arises involving another official-capacity co-defendant in Stephenson (i.e., Black), so too a lawyer representing a client in such litigation who later becomes a federal district judge is not necessarily disqualified from doing his or her job simply because a criminal case arises involving such a former official-capacity defendant.

As for "uniqueness" arising from a judge's former role as a lawyer representing clients in a civil lawsuit on the opposite side of an official-capacity defendant who later becomes a criminal defendant, the parties have not cited such a case and the court's research has not revealed such a case. Nonetheless, the court has located a case where a lawyer (who later became a federal judge) was representing clients on the opposite side of a personal-capacity defendant accused of civil fraud who later became a criminal defendant. In United States v. Hurst, 951 F.2d 1490 (6th Cir. 1991), the federal district judge before his appointment to the bench filed a civil fraud suit for money

46

damages on behalf of a group of investors against Burnett. Id. at 1503. Six months later, the parties

jointly moved to dismiss the civil fraud suit, and the civil case was dismissed.[12] Eight and a half

years later, a federal grand jury indicted Burnett for conspiring to conduct an illegal gambling

business. The illegal gambling indictment was not the same matter as the civil fraud case. By the

time Burnett was indicted, the lawyer who had filed the civil fraud suit on behalf of his former

clients was a federal district judge. Burnett's criminal case was assigned to that judge. Burnett

argued that section 455(a) mandated recusal based on the civil fraud suit. The federal district judge

refused to recuse, and the Sixth Circuit refused to issue a writ of mandamus and affirmed the refusal

to recuse. Both the district judge and the Sixth Circuit concluded that the judge's role as a lawyer

in the civil fraud lawsuit did not create a situation where the judge's impartiality might reasonably

be questioned in resolving Burnett's criminal case. See id.; see also United States v. Walton, 56 F.3d

551, 552-56 (4th Cir. 1995) (that the federal judge had been a partner in a firm in the 1970s and his

law firm represented defendant in four drug cases was too attenuated to trigger recusal under section

455(a) or section 455(b)(2); the judge was appointed in 1990 and the defendant was indicted on drug

charges in 1994); accord United States v. Cherry, 330 F.3d 658, 665-66 (4th Cir. 2003).

The court also has reviewed two cases where a state court judge, while a prosecutor, had

represented the state and personally criminally prosecuted a defendant. That same defendant was

later charged with different criminal conduct, and the former prosecutor had become a judge. In each

case, the judge was permitted to preside in defendant's criminal trial on those different criminal

charges. Specifically, the Supreme Court of Pennsylvania held that even though the trial judge while

formerly serving as a prosecutor had personally criminally prosecuted the defendant on criminal

---

[12]See Pet. for a Writ of Mandamus, Ex. 8 (Dist. Court. Mem. Denying Mot. to Recuse), In re Burnett, No. 90-5450 (6th Cir. Mar. 26, 1990) (on file with Sixth Circuit).

charges, that prior prosecution did not require the trial judge's recusal in a different criminal case involving that defendant. See Commonwealth v. Darush, 459 A.2d 727, 731 (Pa. 1983) (analyzing Canon 3(c) of the Code of Judicial Conduct, which tracks in relevant part 28 U.S.C. § 455(a) and § 455(b)(2)). Similarly, the Sixth Circuit held that even though a state trial judge, while a prosecutor, had represented the state and personally criminally prosecuted the defendant in 1968 and 1970 and obtained two convictions, the state trial judge could preside at defendant's 1975 trial for murder and armed robbery. See Jenkins v. Bordenkircher, 611 F.2d 162, 166-67 (6th Cir. 1979) (rejecting due process claim that the trial judge was not an impartial decision-maker based on his past work in prosecuting the defendant).

A number of other cases involving a federal judge's former work as a lawyer for clients support non-recusal under section 455(a). See, e.g., Cipollone v. Liggett Group, Inc., 802 F.2d 658, 659-60 (3d Cir. 1986); Chitimacha Tribe, 690 F.2d at 1166 (recusal not required under section 455(a) or 455(b)(2) simply because the judge, six years earlier and prior to his appointment to the bench, had represented Texaco on an unrelated matter and Texaco was now a named defendant in a civil case); In re United States, 666 F.2d at 695-98; Nat'l Auto Brokers Corp. v. General Motors Corp., 572 F.2d 953, 958-59 (2d Cir. 1978). In light of the foregoing precedent, the court rejects Black's "uniqueness" argument under DeTemple.

2.

Next, the court examines the "confluence of facts" under DeTemple, including Black's arguments: (1) that I formerly represented four plaintiffs that Black describes as "political opponents," (2) that the offense conduct described in Black's federal criminal information (i.e., 2000-2005) overlaps with the time period of the Stephenson litigation, and (3) that a reasonable outside observer would view the Stephenson redistricting litigation as the event that "generated"

48

Black's criminal conduct and might view my further participation in Black's criminal case as me having the "last word" concerning redistricting. Def.'s Mot. to Recuse 2, 13-19.

As for prior legal representation of Republican clients whom Black describes as "political opponents," a judge's prior membership in or affiliation with a politically related organization does not, by itself, provide a reasonable basis for questioning a judge's impartiality in cases in which that organization is a party. See Sierra Club v. Simkins Indus., Inc., 847 F.2d 1109, 1117 (4th Cir. 1988). In Sierra Club, the Fourth Circuit affirmed the denial of a recusal motion under section 455(a) and stated that "litigants are entitled to a judge free of personal bias, but not to a judge without any personal history before appointment to the bench." Id.; see also Higganbotham v. Okla. ex rel. Okla. Transp. Comm'n, 328 F.3d 638, 645 (10th Cir. 2003); In re Mason, 916 F.2d at 386.

Similarly, where those who once held elective office later become federal judges, such judges are not necessarily recused from participating as judges in analyzing or applying laws that they voted for or against as elected officials. See, e.g., Laird v. Tatum, 409 U.S. 824, 831-32 (1972) (Rehnquist, J.) (collecting cases and examples); In re Mason, 916 F.2d at 386-87; Shaw v. Martin, 733 F.2d 304, 316 (4th Cir. 1984). The same principle holds true with respect to lawyers who later become federal judges. Accordingly, former prosecutors or defense lawyers are not necessarily barred from presiding as a judge in criminal cases. See, e.g., United States v. Thompson, 76 F.3d 442, 450-51 (2d Cir. 1996). Likewise, former civil rights attorneys are not necessarily barred from presiding as a judge in civil rights cases. See, e.g., Wessmann, 979 F. Supp. at 916-18; Lindsey v. City of Beaufort, 911 F. Supp. 962, 971-72 (D.S.C. 1995). In light of the foregoing precedent and the prior discussion of the Stephenson redistricting litigation vis-a-vis Black's federal criminal case, my prior legal work in Stephenson does not require recusal under section 455(a).

Moreover, a reasonable outside observer would not find an appearance of partiality under

section 455(a) simply because Black's offense conduct set forth in the federal criminal information and his state criminal information overlaps in time with my participation as a lawyer in the Stephenson litigation. According to the federal criminal information and factual basis, Black's offense conduct with the chiropractors took place between 2000 and 2005. See Black, No. 5:07-CR-42-1-D, Crim. Inf. (E.D.N.C. Feb. 15, 2005). According to the state criminal information, Black's offense conduct in offering and giving a bribe to Decker took place between November 6, 2002, and February 19, 2003, and his offense conduct in obstructing justice with respect to his campaign finance disclosure reports took place between February 14, 2002, and December 3, 2005. See Black, No. 07CRS10444, Inf. (Wake County Super. Ct. Feb. 20, 2007).

The Board of Elections did not begin investigating Black until June 2004 when it received a complaint from Bob Hall of Democracy North Carolina. See State Tr. 19. At that time, I already was a federal judge in that I was appointed a United States Magistrate Judge on February 9, 2004, and left private practice on that date. On May 3, 2005, I was appointed a United States District Judge. Although neither the United States nor Black has offered evidence as to when federal and/or state agents began criminally investigating Black for the charges set forth in his federal criminal information or his state criminal information, nothing in the record suggests that agents began criminally investigating Black for those crimes until after I became a federal judge on February 9, 2004.[13] In any event, as a lawyer in private practice, I obviously never participated in any criminal investigation of Black. Cf. Thompson, 76 F.3d at 450-51 (a judge who has served as a United States Attorney is not considered "counsel" under 28 U.S.C. § 455(b)(3) with respect to a criminal case if the criminal investigation that led to the indictment began after he left the office of United States

_____

[13]The record in Decker's case reflects that Decker received a federal grand jury subpoena in June 2005. See supra at 7. Black then paid $5,000 to Decker's lawyer in June 2005. See supra at 7.

Attorney; therefore, recusal is not required under section 455(b)(3) or 455(a)). Moreover, simply because Black committed the offense conduct as to his federal conviction and his two state-court convictions during a portion of the time while I was in private practice and engaged in the Stephenson redistricting litigation does not create an appearance of partiality. Cf. id. (recusal is not required "merely because some part of the offense was committed while the judge was the United States Attorney, if he left that position before that office's investigation of the offense began"); see Ruzzano, 247 F.3d at 695; United States v. Miller, 2007 WL 731310, at *1-2 (4th Cir. Mar. 8, 2007) (per curiam) (unpublished); United States v. Agnew, 147 Fed. Appx. 347, 352-54 (4th Cir. Sept. 2, 2005) (per curiam) (unpublished).

Finally, the court addresses Black's argument that "Judge Dever's victory in the redistricting case generated the need for Black's alleged deal with Decker, and Black's alleged deal with Decker destroyed Judge Dever's victory in the redistricting case." Def.'s Mot. to Recuse 14. Ergo, according to Black, a reasonable outside observer might reasonably view Judge Dever's participation in Black's federal criminal case as Judge Dever having the "last word" on redistricting. Id. at 2.

In order to assess Black's argument about how a reasonable outside observer might reasonably view the alleged causal connection between my role as a lawyer representing clients in the redistricting case and Black's criminal conduct in his federal criminal case, a discussion of causation and Black's "logic" is necessary. Specifically, Black's argument is premised on a reasonable outside observer using the following causal chain and the following "logic":[14] if the plaintiffs had not hired lawyers (including Dever) and filed suit in Stephenson in November 2001, then the North Carolina Supreme Court never would have invalidated the November 2001

---

[14]The dates in the chronology are derived from the procedural history described in Stephenson II. See Stephenson II, 357 N.C. at 302-04, 582 S.E.2d at 248-49.

redistricting statute in April 2002 and the state trial court never would have conducted remedy proceedings in May 2002. If the state trial court had never conducted remedy proceedings in May 2002, then the General Assembly never would have enacted the May 2002 redistricting statute which the state trial court invalidated in May 2002 for failure to comply with Stephenson I. If the state trial court never would have invalidated the redistricting statute in the May 2002 for failure to comply with Stephenson I, then the state trial court never would have adopted its own remedial redistricting plans for the Senate and House in May 2002. If the state trial court had not adopted its own plans, then the November 2002 elections would never have been held using those plans. If the November 2002 elections had never been held using those plans, then North Carolina's voters would not have voted in November 2002 in the districts contained in the plans. If North Carolina's voters had not voted in those districts in November 2002, then the November 2002 election results would not have yielded 61 representative-elect Republicans in the House and 59 representative-elect Democrats in the House. If there had not been a 61-59 split, then Decker never would have met with Black at a restaurant in Salisbury in December 2002. If Decker never met with Black at a restaurant in Salisbury in December 2002, then Decker never would have proposed the bribery scheme. If Decker had never proposed the bribery scheme, then Black never would have agreed to the bribery scheme. Absent the bribery, Dever's alleged "victory" in the Stephenson redistricting litigation would not have been "destroyed." Def.'s Mot. to Recuse 14. Ergo, Judge Dever should not preside in Black's 2007 federal criminal case in which Black pleaded guilty to soliciting and accepting cash from chiropractors between 2000 and 2005 because Judge Dever's legal work in the November 2001 redistricting lawsuit is "inextricably intertwined" with Black's federal criminal case.

To state Black's causal chain and "logic" is to reveal at least two major fallacies. First, to the reasonable outside observer, Black's argument exemplifies the fallacy of false cause (i.e., post

52

hoc ergo proctor hoc). Black erroneously reasons from what happened in sequence to the assumption of a causal connection. Second, to the reasonable outside observer, Black's argument reveals the fallacy of two false premises in his effort at syllogistic reasoning. The two false premises are that (1) "Judge Dever's victory in the redistricting case generated the need for Black's alleged deal with Decker," and (2) "Black's alleged deal with Decker destroyed Judge Dever's victory in the redistricting case." Def.'s Mot. to Recuse 14. Both premises are false and ignore the role of lawyers representing clients and ignore multiple intervening independent actors and intervening independent causes for events in 2001, 2002, and 2003; therefore, Black's conclusion does not logically follow.

In DeTemple, the Fourth Circuit implicitly rejected similarly fallacious reasoning under section 455(a): if DeTemple had paid his debts after receiving the judge's dunning letters in 1987 and 1988, then DeTemple never would have filed for bankruptcy in 1989 and listed the judge's client as a creditor. If DeTemple had never filed for bankruptcy in 1989, then he never would have committed bankruptcy fraud. If he had never committed bankruptcy fraud, then he never would have been indicted for bankruptcy fraud in 1993. Ergo, the judge's letters are inextricably intertwined with DeTemple's criminal prosecution such that a reasonable outside observer might reasonably question the judge's ability to be impartial in DeTemple's criminal case. See DeTemple, 162 F.3d at 287. Just as the Fourth Circuit rejected DeTemple's reasoning, so too this court rejects Black's reasoning.

3.

In sum, a reasonable outside observer, cognizant of all facts and circumstances, would not reasonably question that my involvement as a lawyer in the Stephenson redistricting litigation or my past associations with anyone or any group might affect my ability to fairly, thoroughly, and impartially handle Black's federal criminal case. See 28 U.S.C. § 455(a).

53

## C.

Black also argues that "statements" made in briefs filed during the redistricting litigation "could lead a reasonable observer to believe [I] was biased against Democratic legislators generally, and Black in particular." Def.'s Mot. to Recuse 17. Black claims that the briefs "repeatedly impugned the integrity and motivations of Democratic leaders" in the redistricting litigation and reflect an "opinion of Black as an individual willing to manipulate the electoral process to fit his own ends" that has "persisted to the present day." Id. at 17-18. As a result, Black argues, the statements in the Decker sentencing order describing the Decker-Black conspiracy may create an appearance of partiality derived from the redistricting litigation. Id. at 19. Finally, Black argues that statements in the Decker sentencing order alone may indicate an appearance of partiality if "they arise from an extrajudicial source." Id.

## 1.

The court rejects Black's attempt to link the Stephenson briefs to the Decker sentencing order. Black collects quotes from the Stephenson briefs where the plaintiffs argued that the redistricting statutes were politically motivated and prevented an election consistent with the North Carolina Constitution and compares snippets of language in the lengthy briefs to snippets of language in the 26-page Decker sentencing order. See id. at 18. The premise of the Stephenson lawsuit, however, was that the redistricting statute violated the North Carolina Constitution and that an injunction was needed. Not surprisingly, the briefs advocated that position. The quotes from the Stephenson briefs do not mention Black by name or impugn anyone's integrity. Nor do the Stephenson briefs state, imply, or foreshadow criminal behavior by Black or anyone else. The litigation was a civil, official-capacity lawsuit about the constitutionality of the November 2001 and May 2002 redistricting statutes. Black's "reputation" and "integrity" were not "on the line" in that

54

litigation. See Cheney, 541 U.S. at 918-19. Further, the language in the Stephenson briefs and the Decker sentencing order is not the same, and nothing in the Decker sentencing order was derived from any extrajudicial source.

In assessing Black's reliance on quotes from briefs submitted in the redistricting litigation,[15] the court also believes that a reasonable outside observer would understand the distinction between a lawyer's role as an advocate and the views of the lawyer's clients. Notably, all of the "statements" that Black quotes come from briefs that were co-authored on behalf of former clients. However, the North Carolina Rules of Professional Conduct and the American Bar Association Model Rules of Professional Conduct codify the longstanding principle that a client's views are not imputed to the lawyer. See Model Rules of Prof'l Conduct R. 1.2(b); N.C. Rules of Prof'l Conduct 1.2(b) ("A lawyer's representation of a client, including representation by appointment, does not constitute an endorsement of the client's political, economic, social or moral views or activities.").[16]

Moreover, the statements in the Decker sentencing order about which Black complains described the court's views of the crime that Decker admitted committing and for which he was convicted and sentenced. Nothing in the Decker sentencing order was derived from an extrajudicial

---

[15]Black cites the Stephenson briefs. See Def.'s Mot. to Recuse 18. Black also references my work as a lawyer in a congressional redistricting case in the mid-1990s. See id. at 12-13. At that time, Black was a member of the General Assembly, but not the Speaker. Finally, Black cites a redistricting case handled by lawyers in my old law firm prior to and just after I joined my old law firm in October 1992. See id.

[16]During his 2005 confirmation hearings, Chief Justice Roberts was asked about positions he advanced in legal briefs and other legal documents on behalf of clients. Chief Justice Roberts explained that the principle "that you don't identify the lawyer with the particular views of the client, or the views that the lawyer advances on behalf of a client, is critical to the fair administration of justice." Confirmation Hr'g on the Nomination of John G. Roberts, Jr. to be Chief Justice of the United States Before the Senate Comm. on the Judiciary, 109th Cong. at 254 (2005) (statement of John G. Roberts).

source, and the court obviously credited Decker's statements and the other evidence received in Decker's case about the conspiracy. In light of the evidence, this court certainly was permitted to form the opinions reflected in the <u>Decker</u> sentencing order. Further, that this court criticized the political corruption described in that order is not unique. <u>See, e.g.</u>, <u>United States v. Newton</u>, 2007 WL 1098479, at *1 (D. Conn. Apr. 10, 2007) (state senator perpetrated a "repeated and continuous betrayal of the public trust" and "made a business out of his public office"); <u>United States v. Vazquez-Botet</u>, 2007 WL 316438, at *2 (D.P.R. Jan. 31, 2007) (defendants' extortion was "particularly crass," done "in order to greedily satisfy their own personal and political designs," and "dealt a demoralizing blow to the public's confidence in Government integrity").

In <u>Liteky</u>, the Supreme Court stated that "opinions formed by the judge on the basis of facts introduced or events occurring in the course of the current proceedings, or of prior proceedings, do not constitute a basis for [a recusal motion] unless they display a deep-seated favoritism or antagonism that would make fair judgment impossible." <u>Liteky</u>, 510 U.S. at 555. The Fourth Circuit – both before and after <u>Liteky</u> – repeatedly has applied this principle in denying motions to recuse under section 455(a). For example, in <u>United States v. Carmichael</u>, 726 F.2d 158, 160-62 (4th Cir. 1984), the district judge made several statements in court deriding the defendant's arguments and motions during the defendant's re-trial before the same judge. Among the comments, the judge stated "You may get relief from the appellate court but you are not going to get it from me" and that he had "been down this road before with the same defendant." <u>Id.</u> at 161. The Fourth Circuit found no appearance of bias and admonished the defendant for taking the judge's remarks out of context. <u>Id.</u> at 161-62; <u>see</u> <u>United States v. Mitchell</u>, 886 F.2d 667, 671 (4th Cir. 1989).

Similarly, the Fourth Circuit repeatedly has upheld denials of recusal motions under section 455(a) even when the judicial comments in open court or in written orders express negative views

concerning a litigant. For example, in Binakonsky v. Ford Motor Co., 4 Fed. Appx. 161, 166-67 (4th Cir. Feb. 15, 2001) (per curiam) (unpublished), the judge repeatedly referred to a wrongful-death plaintiff as an "incorrigible alcoholic and drug addict" in written orders. The defendant automobile manufacturer presented evidence that the plaintiff was drinking on the day of the accident and had a history of drug and alcohol abuse. Id. at 166. The Fourth Circuit held that the court had not revealed an "extrajudicial predisposition against alcoholics and drunk drivers." Id.; see also United States v. Daniels, 178 Fed. Appx. 189, 190 (4th Cir. Apr. 18, 2006) (per curiam) (unpublished) (negative judicial comments about defendant at sentencing of co-conspirator); United States v. Cyrus, 103 Fed. Appx. 714, 714-15 (4th Cir. July 14, 2004) (per curiam) (unpublished); United States v. Reiners, 1999 WL 547936, at *4 (4th Cir. July 28, 1999) (per curiam) (unpublished).

Further, to the extent Black's motion to recuse is premised on this court's order of May 1, 2007, concerning possible departures under the guidelines or a possible variance sentence, a defendant awaiting sentencing cannot use 28 U.S.C. § 455(a) to circumvent a hearing or a ruling that the defendant believes might be unfavorable. See United States v. Gordon, 61 F.3d 263, 267-68 (4th Cir. 1995). In Gordon, the defendant filed a section 455(a) recusal motion at her sentencing hearing and alleged that the judge had abandoned his impartiality by becoming an advocate for an upward departure. After reading the initial presentence report, the judge notified the parties of possible grounds for upward departures and enhancements he was considering, including obstruction of justice. Id. The Fourth Circuit, relying on Liteky, held that the judge "did nothing even remotely inappropriate at any point." Id. at 268; see also United States v. Eldridge, 1998 WL 393705, at *1 (4th Cir. July 2, 1998) (per curiam) (unpublished).

In light of the foregoing precedent, the court rejects Black's arguments that the statements made in redistricting briefs create an appearance of partiality against Black in his federal criminal

57

case. Likewise, nothing in the <u>Decker</u> sentencing order was derived from any extrajudicial source. Finally, although Black may not like the <u>Decker</u> sentencing order and may not like this court's May 1, 2007, order, nothing in either order was improper or creates a situation where the court's "impartiality might reasonably be questioned." 28 U.S.C. § 455(a).

2.

Lastly, Black argues that certain statements in the 26-page <u>Decker</u> sentencing order may create an appearance of partiality if "they arise from an extrajudicial source." Def.'s Mot. to Recuse 19. Black then cites two Fourth Circuit cases and argues that a reasonable observer might reasonably find an appearance of partiality from the <u>Decker</u> sentencing order. See <u>id.</u> (citing <u>Hathcock v. Navistar Int'l Transp. Corp.</u>, 53 F.3d 36 (4th Cir. 1995) and <u>In re Federal Deposit Ins. Corp.</u>, 1987 WL 24496 (4th Cir. Nov. 24, 1987) (per curiam) (unpublished)).

Black cites three things in the <u>Decker</u> sentencing order. First, this court described Decker and Black's conduct as "an epic betrayal." See <u>Decker</u>, No. 5:06-CR-197-1-D, Sentencing Order 20 (E.D.N.C. Apr. 27, 2007). Second, this court stated that "Black's selfish tyranny was motivated by a feverish lust to retain power." <u>Id.</u> Finally, Black argues that this court "alluded to the redistricting issue" when it stated that citizens and legislators "may question the legitimacy of certain laws enacted in 2003 and 2004 in light of the corrupt scheme that resulted in Black becoming co-Speaker." Def.'s Mot. to Recuse 19.

The court rejects Black's argument. As stated, nothing in the <u>Decker</u> sentencing order was derived from any extrajudicial source. In light of the evidence presented, this court appropriately could describe its view that Decker and Black did engage in an epic betrayal and could describe its view of the self-evident motives of Decker and Black.

As for the reference in the <u>Decker</u> sentencing order to whether citizens and legislators "may

58

question the legitimacy of certain laws enacted in 2003 and 2004 in light of the corrupt scheme that resulted in Black becoming co-Speaker," that reference was in the court's extensive discussion of an upward departure under U.S.S.G. § 5K2.7. See Decker, No. 5:06-CR-197-1-D, Sentencing Order 15-16 (E.D.N.C. Apr. 27, 2007). The reference did not mention or allude to redistricting. Rather, the court analyzed the governing standard under section 5K2.7 and found that Decker and Black's conspiracy from "November 2002 until March 2006" created a "severe potential or actual disruption to the functioning of the House of Representatives." Decker, No. 5:06-CR-197-1-D, Sentencing Order 16 (E.D.N.C. Apr. 26, 2007). The court mentioned the 2003-04 session in the Decker sentencing order because the court was sentencing Decker for his crime and that was the only session in which Decker participated after conspiring with Black. There was nothing improper in the court's analysis in the Decker sentencing order, nothing in it concerned redistricting, and nothing in it was derived from any extrajudicial source.

Black erroneously relies on Hathcock and In re Federal Deposit Ins. Corp. Both cases involved judges who inserted themselves into cases by making extrajudicial comments. In Hathcock, the judge directed a party's counsel (ex parte) to draft the factual basis for a proposed default judgment against the corporate defendant, inserted the court into ongoing litigation by having his law clerk file an affidavit in response to defendant's recusal motion, and made extrajudicial "blunt remarks" about corporate defendants to a meeting of trial lawyers while the parties' jury trial was pending. See Hathcock, 53 F.3d at 41. The Fourth Circuit ordered recusal under section 455(a). See id. In Federal Deposit Ins. Corp., the Fourth Circuit ordered recusal under section 455(a) due to the judge's numerous extrajudicial comments. See In re Federal Deposit Ins. Corp., 1987 WL 24496, at *1-3. That case involved a lawsuit by the FDIC concerning Hilton Head. The judge owned a house on Hilton Head and had "repeatedly stated, both in and out [of] the courtroom,

59

his strong predisposition to protect the reputation and economic structure of Hilton Head Island against adverse consequences resulting from FDIC's suit and related litigation." Id. at *2.

Unlike Hathcock and In re Federal Deposit Ins. Co., this court has not inserted itself into Black's federal criminal case by making extrajudicial comments. The comments in the Decker sentencing order were not derived from any extrajudicial source. Moreover, the Fourth Circuit has repeatedly held that mere knowledge obtained within a judge's judicial responsibilities cannot – absent extraordinary facts – require recusal under section 455(a). See, e.g., United States v. Morris, 988 F.2d 1335, 1337 (4th Cir. 1993); United States v. Parker, 742 F.2d 127, 128 (4th Cir. 1984).

This court has located only one case in which the Fourth Circuit found such extraordinary facts. See Rice v. McKenzie, 581 F.2d 1114 (4th Cir. 1978). In Rice, the district judge in a federal habeas case had reviewed the habeas petitioner's claim during his direct appeal in state court. At that time, the judge was Chief Justice of the West Virginia Supreme Court. When the petitioner lost in state court, he filed a federal habeas claim. In the interim, the former Chief Justice had been appointed a federal district judge. Petitioner's claim came to that judge to review. Although the judge did not remember the petitioner's state court case, the Fourth Circuit held that there was "a basis for a reasonable person to form a reasonable basis for questioning [the judge's] impartiality [concerning habeas review] and his capacity to provide the independent federal review that is requisite." Rice, 581 F.2d at 1118. Thus, the Fourth Circuit ordered recusal under section 455(a).

Nothing remotely similar to the facts in Hathcock, FDIC, or Rice is present here. Accordingly, recusal under section 455(a) is not required.

3.

In DeTemple, the sum of the defendant's arguments did not equal an appearance of bias requiring recusal. DeTemple, 162 F.3d at 285. "Indeed, any reasonable observer familiar with the

60

facts of this case would recognize that the number of reasons DeTemple asserts as a basis for recusal reflects his ingenuity in finding conflicts around every corner rather than the merit of his claim." Id. This same conclusion applies to Black's argument under section 455(a). Thus, defendant's motion to recuse is denied.

IV.

As part of its research, the court reviewed numerous cases discussing section 455(a) that neither party cited, including United States v. Bobo, 323 F. Supp. 2d 1238 (N.D. Ala. 2004). In Bobo, the district judge was a second cousin to the sitting governor of Alabama. The sitting governor's immediate predecessor as governor was indicted and the criminal case was assigned to the district judge. Id. at 1239-41. The former governor intended to plead not guilty and go to trial. Early in the case, the United States questioned whether an informed observer might reasonably question whether the judge should preside due to concerns about a perceived risk of bias arising from the judge's family relationship with the current governor and the adverse political relationship between the current and former governor. The district judge responded that he had spent no more than three days during the last 30 years with his second cousin the current governor. Id. at 1241. Further, the district judge stated that political consequences to either politician flowing from the criminal case were not and could not be a concern under section 455. Id. at 1241-42. After analyzing sections 455(a) and 455(b), the district judge concluded that he had not said or done anything that required recusal and that nothing impaired his ability to fairly, thoroughly, and impartially preside in the criminal case. Nevertheless, on the court's own motion, the district judge exercised his discretion, recused in the public interest, and ordered the case to be transferred to another randomly selected district judge. Id. at 1242-43.

In making this decision, the district judge noted the public interest and how disillusioned and

61

cynical many citizens were with government. "The degree of cynicism and distrust infecting the decisions of all branches of government is disheartening. Worse, such lack of trust is dangerous to our evolving experiment in self-governance through a representative democracy." Id. at 1242. Further, the district judge noted that section 455(a) is not focused on reality. It is focused on perception. Id. The district judge recognized the reality that the criminal trial involving the former governor was "of significant import to the entire State." Id. at 1243. In order to avoid having such a significant case turn into a baseless debate about erroneous perceptions concerning the integrity and impartiality of the federal judiciary, the district judge recused. Id.

In Black's case, this court cannot ignore the extraordinary level of cynicism that Black's guilty pleas in this court and in state court have created within the body politic in North Carolina. As Speaker of the House, Black was one of the most powerful leaders in North Carolina government. To read a list of former Speakers in North Carolina is to read a list of public servants who each served North Carolina as Speaker in a distinctive way. As with all former Speakers, the people and Black's fellow legislators entrusted the Office of the Speaker to Black for his safekeeping during his time in that Office. Unlike any former North Carolina Speaker of which this court is aware, Black betrayed that trust by engaging in felonious conduct in that Office. As a result, Black pleaded guilty in this court and in state court, but sentencing has not yet taken place in either court. Sentencing in federal court will take place first, and sentencing in state court will then occur.

Black does not allege any actual bias or prejudice by this court. Needless to say, this court has no such bias or prejudice against Black. Rather, Black discusses perception. Black believes reasonable people might reasonably perceive that his 2007 federal criminal case is about my role as a lawyer in an official-capacity civil redistricting lawsuit filed in 2001. That notion is false. Black's federal criminal case is not about redistricting or my prior work as a lawyer. Black's federal criminal

case is about his guilty plea to soliciting and accepting cash from chiropractors between 2000 and 2005. Further, as demonstrated in Parts II and III of this order, recusal is not required under 28 U.S.C. § 455(a), § 455(b)(1), or § 455(b)(2).

In this case (as in all cases), this court has been fair and impartial in both appearance and fact. Nonetheless, this court has discretion to recuse in the public interest on its own motion. See Bobo, 323 F. Supp. 2d at 1242-43; cf. Cheney, 541 U.S. at 915-16; Microsoft Corp., 530 U.S. at 1301. Black has pleaded guilty to a serious crime. The only thing that remains to be done is for a federal judge to prepare for Black's sentencing hearing, to conduct that hearing, and then to sentence Black. Other federal judges in the Eastern District are available to do those things and to preside in Black's case. Once that sentencing takes place in federal court, then Black can be sentenced in state court. A delay in federal sentencing will delay state sentencing.

Recusal issues under section 455(a) concern perceptions, not reality. In contrast, Black's federal criminal case concerns the stark reality of public corruption in the highest Office in the House. The truly unique element in this case is the reality that the people of North Carolina and the current General Assembly need to have closure on the corrupt chapter that Black has written into the history of the Office of the Speaker. That closure will not come if Black can try to direct the focus of this criminal case away from the reality of his own corruption and instead discuss meritless perceptions about the undersigned. That closure will not come if Black can attempt to delay his sentencing in federal court via interlocutory appellate proceedings discussing meritless perceptions concerning which federal judge should sentence him. That closure will not come until Black is sentenced for the crime to which he pleaded guilty in federal court. That closure will not come until Black is sentenced in state court for the crimes to which he pleaded guilty in that court.

Accordingly, on this court's own motion, and because of the unique reality of Black's federal criminal conduct in North Carolina history, the unique procedural posture of Black's federal criminal case and state criminal case, the unique public need for closure to Black's federal criminal case and state criminal case, and this court's perception of the public interest and the need to reduce cynicism and to promote public confidence in the administration of justice, I recuse from further proceedings in Black's case. See Bobo, 323 F. Supp. 2d at 1243. The Clerk of Court is ORDERED to reassign this case for all further proceedings to another district judge in the Eastern District who accepts criminal cases. The reassignment shall be done pursuant to the Clerk's standard, neutral, random assignment process.

SO ORDERED. This the __5__ day of June 2007.

JAMES C. DEVER III
United States District Judge